00/00/2012  13:17:27 FAX 2132499990      NATIONWIDE LEGAL EXPRESS



A. Raymond Hamrick, III (State Bar No. 93821)
Martin J. Barab (State Bar No. 47419)
Rebecca L. Worden (State Bar No. 270464)
HAMRICK & EVANS, LLP
111 Universal Hollywood Drive, Suite 2200
Universal City, California 91608
Telephone No.: (818) 763-5292
Fax No.: (818) 763-2308

Attorneys for Petitioner
HANNIBAL PICTURES

FILED
CLERK U.S. DISTRICT COURT

JUL 2 6 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

HANNIBAL INC. dba HANNIBAL PICTURES, a California corporation,

　　　　　　　Petitioner,

　　v.

LES FILMS DE L'ELYSEE, a Belgium corporation,

　　　　　　　Respondent.

Case No. CV12-06434 (AS(JGX)

NOTICE OF MOTION AND MOTION FOR ORDER CONFIRMING ARBITRATION AWARD; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF A RAYMOND HAMRICK, III AND EXHIBITS THERETO; [PROPOSED] ORDER

Hearing Date: September 10, 2012
Time: 10:00 AM
Dept.: 5
Judge: Snyder

## TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on September 10, at 10:00 a.m/p.m., or as soon thereafter as this matter may be heard in Department 5 of the above-entitled court, located at 255 East Temple Street, Los Angeles, California 90012, Petitioner HANNIBAL INC. dba HANNIBAL PICTURES ("Petitioner" or "Hannibal"), by and through its counsel of record, Hamrick & Evans, LLP, will and hereby does move for an Order:

1. Confirming the Final Award of the IFTA International Arbitration Tribunal, dated May 15, 2012, resolving Case No. 11-44 ("May 15, 2012 Award") in all respects;

-1-
NOTICE OF MOTION AND MOTION FOR ORDER CONFIRMING ARBITRATION AWARD

2. Entering judgment in conformity therewith;

3. Ordering Respondent LES FILMS DE L'ELYSEE ("Respondent" or "Les Films") to pay Petitioner Hannibal damages in the amount of One Hundred Thousand Four Hundred Eighty Seven Dollars ($100,487) ("Award Amount"), in accordance with the terms of the May 15, 2012 Award;

4. Declaring that the IFTA International Multiple Rights Distribution Agreement ("Agreement") between Petitioner Hannibal and Respondent Les Films, dated November 3, 2009, is terminated, and Respondent shall forthwith return to Petitioner all material previously delivered pursuant to the Agreement, in accordance with the terms of the May 15, 2012 Award;

5. Awarding pre-judgment interest on the Award Amount, at the rate of ten percent (10%) per annum, from the date of entry of the May 15, 2012 Award to the date of entry of Judgment pursuant to this Motion;

6. Awarding post-judgment interest on the total of the Award Amount and pre-judgment interest thereon, at the applicable rate based on the weekly average one year constant maturity Treasury yield, from the date of entry of Judgment pursuant to this Motion to the date of payment;

7. Awarding attorneys' fees and costs incurred in connection with enforcement of the May 15, 2012 Award, including fees and costs relating to this Motion; and

8. Awarding such other and further relief as this Court deems just and proper.

This motion is made pursuant to Section 9 of the Federal Arbitration Act, 9 U.S.C.A. § 9, IFTA Rules for International Arbitration, Rules 8.2 and 12.3, and the IFTA International Multiple Rights Distribution Agreement, dated November 3, 2009 ("Agreement"), by which Petitioner Hannibal and Respondent Les Films are both bound.

This Court has jurisdiction over this matter pursuant to 28 U.S.C.A. § 1332, because the claims are entirely between citizens of the State of California and citizens of a foreign state, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

Venue is proper in the Central District of California pursuant to Section 9 of the Federal

-2-

HAMRICK & EVANS, LLP

1   Arbitration Act, 9 U.S.C.A. § 9, because the award sought to be confirmed was issued in this

2   District. This Court has personal jurisdiction over Respondent by virtue of Petitioner's service of

3   notice of this Motion on Respondent.

4          This Motion is based on this Notice of Motion and Motion, the following Memorandum of

5   Points and Authorities, the attached Declaration of A. Raymond Hamrick, III and the exhibits

6   thereto, the [Proposed] Order filed herewith, and upon such other oral and/or documentary

7   evidence, if any, that may be presented prior to or at the time of hearing on this matter.

8   DATED:  July 26, 2012                          HAMRICK & EVANS, LLP

9

10

11                                          By: _____
                                               A. Raymond Hamrick, III
12                                             Martin J. Barab
                                               Rebecca L. Worden
13                                             Attorneys for Petitioner HANNIBAL PICTURES

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HAMRICK & EVANS, LLP

HAMRICK & EVANS, LLP

1

### MEMORANDUM OF POINTS AND AUTHORITIES

2       Petitioner respectfully submits the following Points and Authorities in support of this

3   Motion for an Order Confirming Arbitration Award.

### I.

### STATEMENT OF FACTS

6   **A.**    **The Parties**

7       Petitioner HANNIBAL INC. dba HANNIBAL PICTURES ("Petitioner" or "Hannibal") is

8   a corporation organized under the laws of the State of California, licensed to do business in the

9   State of California and with its principal place of business located in Los Angeles, California.

10   Declaration of A. Raymond Hamrick, III ("Hamrick Decl."), at ¶ 2. Respondent LES FILMS DE

11   L'ELYSEE ("Respondent" or "Les Films") is an entity formed in Belgium and doing business

12   under the laws of Belguim, with its principal place of business located in the Region of Brussels,

13   Belgium. Hamrick Decl. at ¶ 3.

14   **B.**    **Subject Matter Jurisdiction**

15       This Court has jurisdiction over this matter pursuant to 28 U.S.C.A. § 1332. Subdivision

16   (a)(2) of this statues provides, in pertinent part:

17

18           "The district courts shall have original jurisdiction of all civil
actions where the matter in controversy exceeds the sum or value of

19           $75,000, exclusive of interest and costs, and is between...citizens of
a State and citizens or subjects of a foreign state..."

20   28 U.S.C.A. § 1332.

21       The amount in controversy here is the value of the damages awarded by the terms of the

22   Final Award of the IFTA International Arbitration Tribunal, dated May 15, 2012, resolving Case

23   No. 11-44 ("May 15, 2012 Award"): One Hundred Thousand Four Hundred Eighty Seven Dollars

24   ($100,487). *See* Final Award of the IFTA International Arbitration Tribunal, dated May 15, 2012

25   (Case No. 11-44), Exhibit "A" to Hamrick Decl. As such, the value of the May 15, 2012 award

26   exceeds the minimum amount in controversy required to establish diversity jurisdiction.

27

28

Moreover, for the purposes of determining whether the parties are "diverse" pursuant to 28 U.S.C.A. § 1332, Subdivision (c)(1) provides that "…a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business…." As Hannibal is a citizen of the State of California and Les Films is a citizen of the foreign state of Belgium, complete diversity of citizenship is satisfied.

C.    **Venue and Personal Jurisdiction**

The Central District of California is the proper venue for this matter, and Respondent Les Films is subject to personal jurisdiction in this venue, pursuant to Section 9 of the Federal Arbitration Act. This statute provides, in pertinent part, as follows:

> "If no court is specified in the [arbitration] agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party, and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding."

9 U.S.C.A. § 9.

The agreement of the parties which brings this controversy within the scope of the Federal Arbitration Act is the IFTA International Multiple Rights Distribution Agreement, dated November 3, 2009 ("Agreement"). *See* IFTA International Multiple Rights Distribution Agreement, dated November 3, 2009, Exhibit "B" to Hamrick Decl. This Agreement does not include any terms specifying the court before which an application to confirm an arbitration award shall be made. *Id.* Instead, the Agreement provides only that any dispute thereunder shall be resolved in accordance with the "Rules of International Arbitration of IFTA in effect as of the date the request for arbitration is filed." *Id.* at Subdivision (V)(C)(6). The relevant rules in effect as of the date of the request for arbitration were the IFTA Rules for International Arbitration dated as of June 1, 2009 ("IFTA Rules"). Hamrick Decl. at ¶ 6. The IFTA Rules provide, in sum and substance, that an application for confirmation of an arbitration award thereunder may be made to

HAMRICK & EVANS, LLP

HAMRICK & EVANS, LLP

1  any court with jurisdiction over the parties. *See* IFTA Rules for International Arbitration dated as

2  of June 1, 2009, at § 8.2, 12.5, Exhibit "C" to Hamrick Decl.

3     As neither the Agreement nor the IFTA Rules incorporated therein specify the court before

4  which an application may be brought, "such application may be made to the United States court in

5  and for the district within which such award was made." 9 U.S.C.A. § 9. The May 15, 2012 Award

6  was entered in Los Angeles, California, rendering the Central District of California a proper forum

7  for this petition. Hamrick Decl. at ¶ 7.

8     Under the FAA, general personal jurisdiction over a responding party is established by

9  service of notice of the application for confirmation of the arbitration award. *See* 9 U.S.C.A. § 9

10  ("Notice of the application shall be served upon the adverse party, and thereupon the court shall

11  have jurisdiction of such party as though he had appeared generally in the proceeding."). This

12  Court's *in personum* jurisdiction over Respondent is established by Petitioner's service of notice

13  of this Motion on Respondent in accordance with applicable law, including 9 U.S.C.A. § 9 and the

14  1965 Hague Convention. *See* Hamrick Decl. at ¶ 8; 9 U.S.C.A. § 9 ("If the adverse party shall be a

15  nonresident, then the notice of the application shall be served…in like manner as other process of

16  the court"); Hague Convention on the Service Abroad of Judicial or Extrajudicial Documents in

17  Civil or Commercial Matters, concluded 15 November 1965, at Article 10(a) (providing for cross-

18  border service of process by international mail service); *See Also Ackermann v. Levine*, 788 F.2d

19  830, 838-39 (2d Cir. 1986) (holding that international service of process by mail is permissible

20  under Article 10 of the 1965 Hague Convention).

21     D.    **Respondents' Breach of Agreement**

22     Petitioner Hannibal and Respondent Les Films entered the IFTA International Multiple

23  Rights Distribution Agreement on or about November 3, 2009. Hamrick Decl. at ¶ 9; *See Also*

24  Exhibit "B" to Hamrick Decl. The Agreement granted Les Films a license to distribute the motion

25  picture "Gun" ("Picture") in the territories of Belgium, the Netherlands, and Luxemborg

26  (collectively, "Benelux" of "Territory"). *Id.* The Agreement also explicitly prohibited Les Films'

27  distribution of the Picture beyond the Benelux area, providing in pertinent part:

28

HAMRICK & EVANS, LLP

> "Licensee [Les Films] will honor all restrictions in the exercise of
> the Licensed Rights and the Allied Rights under this Agreement and
> will not exploit any Licensed Right outside the Territory, before the
> end of its Holdback, or after its License Period."

Exhibit "B" to Hamrick Decl., at "IFTA International Standard Terms for Outright Deals."

Subdivision 15.1.4. In reliance upon Les Films' compliance with these terms, Petitioner entered

similar licensing agreements with various distributors for other European countries, including an

exclusive licensing agreement with Marco Polo Productions SAS ("Marco Polo") relating to

distribution in France. Hamrick Decl. at ¶ 10.

Respondent, by and through its various subdistributors, licensees, and agents

("Respondent's Agents"), improperly and intentionally marketed the Picture and caused the sale

and distribution of DVDs of the Picture in France, beyond the Benelux Territory and in violation

of the Agreement. Hamrick Decl. at ¶ 11. Further, the French DVD units of the Picture marketed

by Respondent's Agents were sold at a significantly lower price than the DVD units marketed by

the rightful licensee for distribution in this area. Id.

Subsequent to Respondent's breach and prior to the initiation of the arbitration

proceedings, Marco Polo, the exclusive French distributor of the Picture, assigned all of its rights

and causes of action against Respondent Les Films to Petitioner Hannibal. Hamrick Decl. at ¶ 12.

E.     **Arbitration Award Against Respondents**

Petitioner initiated arbitration proceedings pursuant to IFTA Rules for International

Arbitration by service on Respondent Les Films of a written Notice Of and Demand For

Arbitration, dated June 13, 2011. Hamrick Decl. at ¶ 13. On February 6-8, 2012, this matter was

heard by neutral arbitrator for the IFTA, Sol Rosenthal. Hamrick Decl. at ¶ 14. Both Petitioner and

Respondent appeared and presented witnesses and evidence over the course of the three day

arbitration hearing. Id. On May 15, 2012, Mr. Rosenthal issued an Award in

favor of Petitioner Hannibal and against Respondent Les Films, ordering, as follows, in sum and

substance:

> 1. Les Films is ordered to pay Hannibal damages in the total amount
> of $100,487 ("Award Amount"); and

-4-

1

> 2. If Les Films pays the Award Amount to Hannibal within sixty days of the entry of the May 15, 2012 Award, Les Films shall have the right to continue to distribute the Picture in Benelux in accordance with the Agreement.; however if Les Films fails to pay the Award Amount to Hannibal within sixty days of the entry of the May 15, 2012 Award, the Agreement shall be deemed terminated and Les Films shall return all associated materials to Hannibal.

*See* Exhibit "A" to Hamrick Decl., at "Final Award."

As of the date of this Motion, Respondents have failed, refused, and continue to fail and refuse to pay the Award Amount, and to otherwise comply with the Award. Hamrick Decl. at ¶ 16. Petitioner hereby seeks an Order of this Court confirming the May 15, 2012 Award with interest thereon, and entering judgment in conformity with the Award.

## II.

## LAW AND ARGUMENT

### A.   This Court has Authority to Confirm the May 15, 2012 Award.

This Court's authority to confirm this arbitration award is derived from the terms of the Agreement and applicable federal law. The Agreement provides that disputes thereunder shall be settled by mandatory binding arbitration in accordance with the IFTA Rules for International Arbitration. *See* Exhibit "B" to Hamrick Decl., at Subdivision (V)(C)(6). The applicable IFTA Rules provide, in pertinent part, as follows:

> "8.2...The parties may apply for confirmation and/or enforcement of any arbitration award or order hereunder to the courts of the State of California or of such other state, locality, country or territory as may have jurisdiction over the parties under applicable law, Treaty or Convention.

> ***

> 12.5...Any party may seek confirmation of and/or file or register the Arbitrator's award with a court having jurisdiction to confirm the Arbitrator's award in order to effectuate the enforcement of the award in any and all courts throughout the world."

Exhibit "C" to Hamrick Decl. As such, the Agreement articulates the intent that any award issued in resolution of a dispute between the parties thereto may be confirmed by any Court with jurisdiction to confirm such awards.

-5-

HAMRICK & EVANS, LLP

As a general matter, an agreement to arbitrate contained within a contract, such as that contained in the Agreement, is enforceable under the Federal Arbitration Act ("FAA"):

> "A written provision in…a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract…shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

9 U.S.C.A. § 2. The FAA further provides that the parties may seek confirmation of the award by the District Court for the district in which the award was entered:

> "If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made."

9 U.S.C.A. § 9; *See Also Weststar Associates, Inc. v. Tin Metals Co.*, 752 F.2d 5 (1st Cir. 1985) (concluding that under the FAA, the District Court for District of Massachusetts had jurisdiction to confirm arbitration award entered in Boston between parties of diverse citizenship); *Reed & Martin, Inc. v. Westinghouse Elec. Corp.*, 439 F.2d 1268 (2d Cir. 1971) (holding that District Court for the Southern District of New York had authority to confirm award where parties had diverse citizenship and arbitration took place in New York City)

Here, the May 15, 2012 Award may be confirmed by a court of competent jurisdiction in accordance with the terms of the Agreement and in accordance with the IFTA Rules incorporated by reference therein. *See* Exhibits "B" and "C" to Hamrick Decl. As the May 15, 2012 Award was entered in Los Angeles, California, the United States District Court for the Central District of California is the proper federal court to confirm such award. Accordingly, this Court is empowered to confirm the May 15, 2012 Award resolving the arbitration between Hannibal and Les Films.

HAMRICK & EVANS, LLP

HAMRICK & EVANS, LLP

B.  **The May 15, 2012 Award Must be Confirmed.**

The authorities are in agreement that where an application is made for confirmation of an arbitration award, the court must confirm such application unless amendment or vacatur of the award is justified by statute. 9 U.S.C.A § 9 ("the court **must** grant such an order [confirming the arbitration award] unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title" [emphasis added]). Both Section 9 of the FAA and public policy compel the confirmation of arbitration awards without reargument of the issues resolved at the underlying arbitration. *E.g. Ottley v. Schwartzberg*, 819 F.2d 373, 375-76 (2d Cir. 1987) (noting that the district court is "mandated" to confirm the arbitrator's final award unless modified or vacated pursuant to statute); *See Also Moncharsh v. Heily & Blase*, 3 Cal. 4th 1, 27-28 (1992) (setting forth the law of California that "judicial review of private arbitration awards [is limited] to those cases in which there exists a statutory ground to vacate or correct the award," and explicitly disapproving "[t]hose decisions permitting review of an award where an error of law appears on the face of the award causing substantial injustice [as] inconsistent with the modern view of private arbitration....").

Notably, Respondent has not sought to vacate or modify the May 15, 2012 Award, and indeed,  none of the FAA's grounds for vacatur or modification are implicated in connection with this award. *See* 9 U.S.C.A. §§ 10-11. Accordingly, the May 15, 2012 Award must be confirmed.

C.  Petitioner Hannibal Should be Awarded Pre-Judgment and Post-Judgment Interest.

An award of interest on the May 15, 2012 Award is necessary to adequately compensate Petitioner Hannibal for the lost time between the ascertainment of the damage and the receipt of payment. *E.g. Air Separation, Inc. v. Underwriters at Lloyd's of London*, 45 F.3d 288, 290 (9th Cir. 1995) ("Costs of the loss of use of a money judgment should not be borne by the injured plaintiff, but by the defendant whose initial wrongful conduct invoked the judicial process and who has had the use of the money judgment throughout the period of delay." [internal quotations and citations omitted]).

-7-

HAMRICK & EVANS, LLP

1    As a general matter, the awarding and calculation of pre-judgment interest on an arbitration

2    award is governed by state law, even where the award itself is subsequently confirmed in federal

3    court. *See, e.g., InterDigital Communications Corp. v. Fed. Ins. Co.*, 607 F. Supp. 2d 718 (E.D.

4    Pa. 2009); *Hosier v. Citigroup Global Markets, Inc.*, 11-CV-00971-CMA-CBS, 2012 WL 872624

5    (D. Colo. Mar. 13, 2012). As the Agreement provides that the law of California shall govern, this

6    Court's determination of pre-judgment interest is subject to the specifications of California Civil

7    Code § 3287. *See* Exhibit "B" to Hamrick Decl., at Subdivision (V)(A) ("**Governing Law:** State

8    of California, USA"). This statute provides, as follows:

9         "Every person who is entitled to recover damages certain, or
          capable of being made certain by calculation, and the right to
10        recover which is vested in him upon a particular day, is entitled
          also to recover interest thereon from that day…"
11

12   Cal. Civ. Code § 3287(a). California courts have agreed that the prevailing party to an arbitration

13   becomes, as of the date of the award, "entitled to recover damages certain," and therefore such

14   party is also entitled to post-award, pre-judgment interest on the total arbitration award. *E.g. Britz,*

15   *Inc. v. Alfa-Laval Food & Dairy Co.*, 34 Cal. App. 4th 1085, 1106-07 (1995); *Pierotti v. Torian*,

16   81 Cal. App. 4th 17, 27 (2000). As to the rate at which such interest will accrue, California law

17   further provides:

18        "If a contract entered into after January 1, 1986, does not stipulate
          a legal rate of interest, the obligation shall bear interest at a rate of
19        10 percent per annum after a breach."

20   Cal. Civ. Code § 3289(b). Accordingly, Petitioner Hannibal is entitled to post-award, pre-

21   judgment interest at a rate of ten percent (10%) per annum, from the date of entry of the award,

22   May 15, 2012, to the date of this Court's entry of judgment confirming the May 15, 2012 Award.

23   While pre-judgment interest is controlled by state law, post-judgment interest on an award

24   confirmed in federal court is governed by federal law. *See, e.g., InterDigital Communications*

25   *Corp.*, 607 F. Supp. 2d 718; *Hosier*, 2012 WL 872624. Specifically, 28 U.S.C.A. §1961 states, in

26   pertinent part:

27        "Interest shall be allowed on any money judgment in a civil case
          recovered in a district court….Such interest shall be calculated
28

-8-

HAMRICK & EVANS, LLP

1
2
3

> from the date of the entry of the judgment, at a rate equal to the weekly average 1 year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."

4   Courts have agreed that § 1961 applies to the computation of post-judgment interest from the date

5   of confirmation of the arbitration award by a District Court of the United States. *See, e.g.,*

6   *InterDigital Communications Corp.*, 607 F. Supp. 2d at 720-21 (finding that § 1961 applies where

7   arbitration award is confirmed in federal court); *Hosier*, 2012 WL 872624 (holding that federal

8   statutory rate of post-judgment interest applies to arbitration award confirmed by federal court).

9   The applicable rate for calculating post judgment interest, "the weekly average 1 year constant

10  maturity Treasury yield" ("Post-Judgment Interest Rate"), must be ascertained based on the date of

11  this Court's entry of judgment on this Motion. *See http://www.utd.uscourts.gov/documents/*

12  *int2012.html* (providing up-to-date weekly post-judgment interest rates based on the weekly

13  average 1-year constant maturity Treasury yield). As such, Respondent should be directed to pay

14  post-judgment interest on the total of the Award Amount and the pre-judgment interest thereon, at

15  the applicable Post-Judgment Interest Rate, from the date of entry of judgment on this Motion to

16  the date of full satisfaction of said judgment.

17       D.   **Petitioner Hannibal Should be Awarded Its Attorneys' Fees and Costs.**

18       The IFTA Rules permit an award of costs and attorneys' fees in connection with arbitration

19  thereunder. *See* Exhibit "C" to Barab Decl. at Subdivision 14.1.3. The arbitrator's award reflects

20  the conclusion that the facts and arguments presented justified the award of attorney's fees and

21  costs to the prevailing party in this dispute. It is axiomatic that Petitioner Hannibal has now

22  incurred further costs and fees as a result of Les Films refusal to satisfy or otherwise comply with

23  the May 15, 2012 Award. Therefore, this Court should award Hannibal its fees and costs incurred

24  in connection with enforcement of the May 15, 2012 Award, including fees and costs relating to

25  this Motion. An updated accounting of fees and costs incurred by Hannibal pursuant to the

26  enforcement of the May 15, 2012 Award will be provided to the Court and all parties prior to the

27  hearing on this Motion.

28

**III.**

**CONCLUSION**

For the foregoing reasons, Petitioner HANNIBAL PICTURES respectfully requests that the Court confirm the Final Award of the IFTA International Arbitration Tribunal, dated May 15, 2012, resolving Case No. 11-44 in all respects, entering judgment in conformity therewith, and awarding pre-judgment interest, post-judgment interest, and attorneys' fees and costs incurred in connection with enforcement of this award.

DATED:  July 26, 2012                           HAMRICK & EVANS, LLP


                                        By: _____
                                             A. Raymond Hamrick, III
                                             Martin L. Barab
                                             Rebecca L. Worden
                                             Attorneys for Petitioner HANNIBAL PICTURES

HAMRICK & EVANS, LLP

HAMRICK & EVANS, LLP

## DECLARATION OF A. RAYMOND HAMRICK, III

I, A. RAYMOND HAMRICK, III, declare as follows:

1.      I am an attorney licensed to practice before all the Courts of the State of California and before this District Court. I am a partner with the law firm of Hamrick & Evans, LLP, counsel of record for Petitioner HANNIBAL INC. dba HANNIBAL PICTURES ("Petitioner" or "Hannibal"). I am the primary attorney responsible for handling this matter on behalf of Petitioner. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could and would testify competently to those facts. This declaration is submitted in support of Petitioner's Motion for Order Confirming Arbitration Award.

2.      Petitioner Hannibal is a corporation organized under the laws of the State of California, licensed to do business in the State of California and with its principal place of business located in Los Angeles, California.

3.      Respondent LES FILMS DE L'ELYSEE ("Respondent" or "Les Films") is an entity formed and doing business under the laws of Belguim, with its principal place of business located in the Region of Brussels, Belgium.

4.      The amount in controversy here is the value of the damages awarded by the terms of the Final Award of the IFTA International Arbitration Tribunal, dated May 15, 2012, resolving Case No. 11-44 ("May 15, 2012 Award"): One Hundred Thousand Four Hundred Eighty Seven Dollars ($100,487). A true and correct copy of the Final Award of the IFTA International Arbitration Tribunal, dated May 15, 2012 (Case No. 11-44) is attached hereto at Exhibit "A."

5.      The agreement of the parties which brings this controversy within the scope of the Federal Arbitration Act is the IFTA International Multiple Rights Distribution Agreement, dated November 3, 2009 ("Agreement"). This Agreement does not include any terms specifying the court before which an application to confirm an arbitration award shall be made. Instead, the Agreement provides only that any dispute thereunder shall be resolved in accordance with the "Rules of International Arbitration of IFTA in effect as of the date the request for arbitration is filed." A true and correct copy of the International Multiple Rights Distribution Agreement, dated November 3, 2009 is attached hereto as Exhibit "B."

-1-
DECLARATION OF A. RAYMOND HAMRICK, III

HAMRICK & EVANS, LLP

6.     The relevant "Rules of International Arbitration of IFTA in effect as of the date the request for arbitration is filed" were the IFTA Rules for International Arbitration dated as of June 1, 2009 ("IFTA Rules"). The IFTA Rules provide, in sum and substance, that an application for confirmation of an arbitration award thereunder may be made to any court with jurisdiction over the parties. A true and correct copy of the IFTA Rules for International Arbitration dated as of June 1, 2009 is attached hereto as Exhibit "C."

7.     The May 15, 2012 Award was entered in Los Angeles, California, within the Central District of California.

8.     Petitioner caused service of the Notice of Motion and Motion for Order Confirming Arbitration Award, Memorandum of Points and Authorities in support, this Declaration and Exhibits hereto, and the [Proposed] Order on Respondent in accordance with the requirements of 9 U.S.C.A § 9 and Article 10 of the Hague Convention on the Service Abroad of Judicial or Extrajudicial Documents in Civil or Commercial Matters.

9.     Petitioner Hannibal and Respondent Les Films entered the IFTA International Multiple Rights Distribution Agreement on or about November 3, 2009. The Agreement granted Les Films a license to distribute the motion picture "Gun" ("Picture") in the territories of Belgium, the Netherlands, and Luxemborg (collectively, "Benelux" of "Territory"). The Agreement also explicitly prohibited Les Films' distribution of the Picture beyond the Benelux area.

10.    In reliance upon Les Films' compliance with the terms of the Agreement, Petitioner entered additional licensing agreements with various distributors for other European countries, including an exclusive licensing agreement with Marco Polo Productions SAS ("Marco Polo") relating to distribution in France.

11.    Respondent, by and through its various subdistributors, licensees, and agents ("Respondent's Agents"), improperly and intentionally marketed the Picture and caused the sale and distribution of DVDs of the Picture in France, beyond the Benelux Territory and in violation of the Agreement. The French DVD units of the Picture marketed by Respondent's Agents were sold at a significantly lower price than the DVD units marketed by the rightful licensee for distribution in this area, resulting in damages to Petitioner.

-2-
DECLARATION OF A. RAYMOND HAMRICK, III

12.     Subsequent to Respondent's breach and prior to the initiation of the arbitration proceedings, Marco Polo, the exclusive French distributor of the Picture, assigned all of its rights and causes of action against Respondent Les Films to Petitioner Hannibal.

13.     Petitioner initiated arbitration proceedings pursuant to IFTA Rules for International Arbitration by service on Respondent Les Films of a written Notice Of and Demand For Arbitration, dated June 13, 2011.

14.     On February 6-8, 2012, this matter was heard by neutral arbitrator for the IFTA, Sol Rosenthal. Both Petitioner and Respondent appeared and presented witnesses and evidence over the course of the three day arbitration hearing.

15.     On May 15, 2012, Mr. Rosenthal issued an Award in favor of Petitioner Hannibal and against Respondent Les Films, ordering as follows, in sum and substance:

    1.     Les Films is ordered to pay Hannibal damages in the total amount of $100,487 ("Award Amount"); and

    2.     If Les Films pays the Award Amount to Hannibal within sixty days of the entry of the May 15, 2012 Award, Les Films shall have the right to continue to distribute the Picture in Benelux in accordance with the Agreement.; however if Les Films fails to pay the Award Amount to Hannibal within sixty days of the entry of the May 15, 2012 Award, the Agreement shall be deemed terminated and Les Films shall return all associated materials to Hannibal.

16.     As of the date of this Motion, Respondents have failed, refused, and continue to fail and refuse to pay the Award Amount, and to otherwise comply with the Award.

Executed on July 26, 2012, at Universal City, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____
A. Raymond Hamrick, III

-3-
DECLARATION OF A. RAYMOND HAMRICK, III

HAMRICK & EVANS, LLP

# EXHIBIT "A"

1

2

3

4

5

6

7

8                       IFTA INTERNATIONAL ARBITRATION TRIBUNAL

9

10   HANNIBAL PICTURES,

11              Claimant/Counter-Respondent,                    Case No. 11-44

12          vs.                                                 **FINAL AWARD**

13   LES FILMS DE L'ELYSEE,

14              Respondent/Counter-Claimant.

15

16          This matter was heard on February 6-8, 2012 at the offices of Arnold & Porter LLP, 777

17   South Figueroa Street, 44th Floor, Los Angeles, California 90017 before Sol Rosenthal, Esq., sole

18   neutral arbitrator.  Claimant and Counter-Respondent Hannibal Pictures ("Hannibal") was

19   represented by Martin J. Barab, Esq. of Hamrick & Evans, LLP.  Respondent and Counter-Claimant

20   Les Films de L'Elysee ("Les Films") was represented by Arnaud Nuyts of Liederkerke Wolters

21   Waelbroeck Kirkpatrick.

22          Oral and documentary evidence were introduced at the hearing.  Closing briefs and reply

23   briefs, as well as proposed findings of fact, were submitted by counsel in March and April, 2012.

24

25                                   **FINDINGS OF FACT**

26          1.      This proceeding was initiated by a Notice of and Demand for Arbitration filed by

27   Hannibal on or about June 13, 2011.  Les Films filed Respondent's Statement of Defense and

28   Counterclaim on or about July 28, 2011.  Hannibal filed Claimant's Response to Respondent's

1   Counter-Claim on or about August 30, 2011.  For good cause, the Arbitrator extended the hearing

2   dates to February 2012.

3          2.       On or about November 3, 2009, Hannibal and Les Films entered into an IFTA

4   International Multiple Rights Distribution Agreement ("Agreement") for the distribution of the

5   motion picture "Gun" ("Picture") for the territory of Benelux (namely Belgium, the Netherlands,

6   and Luxembourg).  The Picture stars Val Kilmer and Curtis "50 Cent" Jackson; it was released as a

7   "straight to video" movie in the United States in January 2011.

8          3.       Paragraph VC6 of the Agreement provides in relevant part that "any dispute arising

9   under this Agreement . . . shall be resolved by mandatory binding arbitration under the Rules of

10   International Arbitration of IFTA in effect as of the date the request for arbitration is filed."  The

11   Rules then in effect were the IFTA Rules of International Arbitration dated as of June 1, 2009.

12          4.       The Agreement provides for a Minimum Guarantee to be paid by Les Films to

13   Hannibal of $90,000, which the evidence shows was an expensive fee for a film that was ultimately

14   released straight to video in the United States.  The last installment of the Minimum Guarantee was

15   paid to Hannibal on April 4, 2011.  The Agreement does not restrict how Les Films can market the

16   Picture in the Territory or the number of DVDs that Les Films can manufacture and sell, nor does it

17   provide that Les Films must provide such information to Hannibal or obtain the approval of

18   Hannibal to set the price for the sale of DVDs.  The evidence shows that this was the first

19   agreement entered into between Hannibal and Les Films, and that Hannibal did not seek

20   information from Les Films before or after execution of the Agreement as to how Les Films

21   intended to market the Picture.  Hannibal's main interest was in obtaining a high Minimum

22   Guarantee; in exchange, Les Films was given wide latitude as to how to market the Picture.

23          5.       On February 28, 2011, Hannibal entered into an IFTA International Multiple Rights

24   Distribution Agreement with Marco Polo Productions SAS ("Marco Polo") for the distribution of

25   the Picture in the territory of France and Switzerland.  Richard Rionda Del Castro is the main owner

26   and CEO of Hannibal; he is also a majority shareholder and President of Marco Polo.

27          6.       On February 28, 2011, Marco Polo and MEP Video ("MEP") executed a Video

28   Distribution Agreement, primarily for the territory of France, whereby MEP became the exclusive

1    video distributor of DVDs and Blu-Rays for the Picture in France.  Initially, this agreement

2    provided that Marco Polo would be paid exclusively through a 50% royalty for the video rights,

3    without any Minimum Guarantee; later the agreement was amended, according to testimony at the

4    hearing, to provide that MEP paid a Minimum Guarantee of 50,000 Euros in exchange for a

5    reduction of the royalty to 25% for the video rights.

6           7.     On April 26, 2011, Les Films accepted an offer from Melimedias S.A.

7    ("Melimedias"), a Belgian company, to purchase 20,000 DVDs of the Picture at 2.60 Euros per unit,

8    for a total of 52,000 Euros.  Bernard Brawerman, Chairman of the Board and a principal owner of

9    Les Films, testified that he received no offers to purchase DVDs of the Picture from any company

10   except Melimedias.  Les Films arranged for manufacture of the DVDs by MPO, a laboratory in

11   France.  Les Films arranged with an artwork company, Stay-Tuned, for the creation of the artwork

12   for the DVD cover.  The DVD cover is distinctive and looks different from the French version; the

13   Les Films' cover shows both Curtis "50 Cent" Jackson and Val Kilmer (the latter actor does not

14   appear on the French version) and it includes in the background a rendering of high rise buildings.

15          8.     On May 25, 2011, the French DVD and Blu-Ray of the Picture were released in

16   France at the retail price of 19.99 Euros.  On that same day, the Belgian DVDs of the Picture were

17   released at a retail price of 9.99 Euros.

18          9.     On June 9, 2011, Mr. Rionda of Hannibal sent an email to Mr. Brawerman of Les

19   Films stating that Les Films had licensed and sold thousands of Belgian DVDs and Blu-Rays to

20   France.  Mr. Brawerman replied by email denying that Les Films had sold DVDs to France.  Mr.

21   Brawerman also sent an email on June 10, 2011 to Andre Melis of Melimedias advising Melimedias

22   to be particularly careful in selling DVDs only to the Belgian and Luxembourg markets and to take

23   necessary measures to ensure the DVDs were not exported to France.  Melimedias answered the

24   next day stating they had sold nothing outside Belgium and Luxembourg and that they would "keep

25   a close eye that no problem crop up".

26         10.    On June 9, 2011, Hannibal notified Les Films by email that the Agreement "is

27   hereby terminated for breach and fraud".

28

11.     The evidence shows that a French company called BCG has written to Hannibal's French counsel on January 17, 2012 stating that BCG purchased DVDs of the Picture for sale in France from a Belgian company called Melongolia. The details of such purchase, e.g., number of units and date, were not furnished. Melongolia is a company owned or controlled by Andre Melis, who also owns or controls Melimedias. Both companies are at the same address, both are in the business of distributing DVDs, and both have overlapping directors and officers. The evidence indicates that Melimedias may have sold an unidentified number of DVD units to Melongolia which resold them to BCG, a French company, for sale in France. This sale may have been made by Melimedias to Melongolia because Melimedias was involved, or about to be involved, in bankruptcy proceedings but Melongolia was not. For purposes of this arbitration, Melimedias and Melongolia will be treated as a single entity with respect to transactions between them. We find that any purported sale by Melemedias to Melongolia was not an arm's length transaction and should not be deemed a "first sale".

12.     The evidence as to Melimedias' sales of the DVDs of the Picture remains unclear. Melimedias has refused to reply to requests for information from Les Films, from Les Films' counsel, and from Hannibal's French counsel. On August 5, 2011, Melimedias filed for bankruptcy protection with the Belgian courts. A dispute has arisen between Les Films and Melimedias in relation to unpaid invoices due from Melimedias to Les Films of about 800,000 Euros.

13.     The certified report from a Belgian governmental bailiff dated July 19, 2011 states that on that date there were still 13,818 DVDs in the warehouse of Melimedias. Since the release date of the Picture in both Belgium and France was May 25, 2011, it would appear that not more than 6,182 Belgian DVDs were sold by Melimedias from May 25 to July 19, 2011.

14.     The evidence from Hannibal and MEP does not establish the number of Belgian DVDs that were sold into France during the initial release period or thereafter.

15.     Evidence submitted by Les Films from GfK Retail and Technology Benelux B.V., which tracks DVD sales in prime retail shops in Belgium, purports to show that 411 DVDs of the Picture were sold in Belgium in 2011. Hannibal disputes the accuracy of this information. Les Films contends that DVDs of the Picture were also sold in low cost chains of Belgian supermarkets

1  and other discount locations, but Les Films has been unable to furnish data as to the number of units

2  sold.

3       16.    In summary, the evidence does not establish how many of the Belgian DVDs were

4  sold in Belgium and/or how many were sold into France.  However, the evidence shows that

5  Melongolia, a company closely allied with Melimedias, sold an unidentified number of DVDs of

6  the Picture to BCG, a French company, for sale in France.  Further, Hannibal presented testimony

7  that as a result of the sale of some quantity of Belgian DVDs into France, at least one substantial

8  French retailer returned a large number of its French DVDs to MEP, thereby impacting MEP's sales

9  of DVDs in France.

10       17.    We now turn to a consideration of Hannibal's claims against Les Films.  Hannibal

11  has contended that Les Films conspired with Melimedias and Melongolia to defraud Hannibal by

12  selling the 20,000 DVDs sold by Les Films to Melimedias into France at discounted prices.

13  Hannibal has also alleged that Les Films fraudulently misrepresented or concealed that it did not

14  intend to distribute the DVDs of the Picture to retail outlets in Belgium but rather planned to sell

15  them into France at discounted prices.

16       18.    Hannibal did not prove its claims of a fraudulent conspiracy or fraudulent

17  misrepresentation or concealment by Les Films by a preponderance of the evidence.  There was no

18  direct evidence of fraud, but rather suspicions and conjecture.  In fact, the following evidence

19  supports Les Films' position that there was no fraud.  Mr. Brawerman of Les Films, in his

20  negotiations with Mr. Rionda of Hannibal, primarily negotiated as to the amount of the Minimum

21  Guarantee.  There was no discussion about how the DVDs would be marketed in Benelux.  Mr.

22  Brawerman did not represent that Les Films would sell the DVDs directly to retail stores.  In

23  exchange for paying a high Minimum Guarantee, Les Films was given broad discretion, without

24  contractual restrictions, as to how to market the Picture in Benelux.  Thus, Hannibal did not

25  establish the elements to support a claim for fraud, i.e., that Les Films made a false representation of

26  a material fact; that Les Films knew the representation was false; that Les Films intended to induce

27  reliance on that false representation; and that Hannibal actually, and justifiably, relied upon such

28  false representation.  Further, if Les Films had intended to ship its DVDs to the French market, as

alleged, the DVDs would have presumably been made to look the same or substantially similar to the DVDs being sold by the French distributor. Instead, the DVD cover prepared by Les Films is distinctive and different from the French DVD cover made by Hannibal. Moreover, the Belgian DVDs include on the back a reference number that allows them to be identified or tracked as coming from Belgium. If the purpose of Les Films was to conceal or defraud, no such identification number would have been included. In addition, Les Films and Melimedias are competitors in the Benelux film market, have never been close partners, and are currently in dispute over large unpaid invoices due from Melimedias to Les Films. Furthermore, although Hannibal argues that Les Films arranged for an exorbitant number of DVD units, the evidence shows that 20,000 units was not unreasonable, taking into account that the term of the Agreement was 12 years and compared to the range of units Les Films has manufactured for other films for the French speaking market of Belgium and Luxembourg. Les Films could market the Picture as it chose under the Agreement, and it decided to sell a larger quantity of DVDs at a reduced price, which is a common strategy for a direct to video film, as opposed to the decision of Hannibal and MEP to market the Picture as a "blockbuster" for the French market and at premium prices.

19.     Next, Hannibal maintains that Les Films breached its warranty not to exploit any licensed rights outside the territory of Benelux. There is an express warranty in paragraph 15.1.4 of the Standard Terms of the Agreement which states as follows:

> Licensee will honor all restrictions in the exercise of the Licensed Rights and the Allied Rights under this Agreement and will not exploit any Licensed Right outside the Territory, before the end of its Holdback, or after its License Period.

20.     It is unquestionable that the entire output of DVDs was sold by Les Films to Melimedias, which was the exclusive DVD distributor for Les Films. Further, the evidence indicates that Melimedias sold or transferred DVDs to its related company, Melongolia, which in turn sold DVDs to a French company, BCG, for sale in France, and those DVDs were sold for a reduced price in France, much lower than the price of the French DVD units distributed by MEP. Such actions constitute a breach of the express warranty in paragraph 15.1.4 that Les Films would not exploit the Picture outside Benelux.

21.     Les Films' assignment of the DVD rights to Melimedias did not require the approval of Hannibal, as argued by Hannibal, because under paragraph 17.1 of the Standard Terms of the Agreement, Les Films was only prohibited from an assignment or sublicense with Hannibal's approval before payment in full of the License Fee or Minimum Guarantee.  The evidence shows that the assignment to Melimedias occurred after the full payment of the Minimum Guarantee.

22.     Nevertheless, the evidence supports a finding that Les Films, in substance, assigned its DVD rights under the Agreement for French speaking Benelux to Melimedias, even though there was no technical assignment.  By the sale of DVDs by Melongolia to BCG, Les Films became responsible for a breach of paragraph 15.1.4.  There is nothing in the Agreement which releases Les Films from its obligations in the event it assigns any of its rights.  Thus, despite this de facto assignment to Melimedias, Les Films is not released from its obligations under the Agreement.

23.     The Agreement provides in paragraphs V(A) and V(C)(6) that the governing law will be that of the State of California.  This provision is not limited to issues of contract law, as alleged by Les Films.  Les Films contends that under the first sale rule, once goods have been sold initially, there can be no further restriction on the free movement of goods within the territory of the European Union, e.g., from Belgium to France.  However, even if this principle applied here, which it does not, we believe that the first sale of DVDs was made by Melimedias/Melongolia to BCG in France, in violation of the Agreement.  The same would apply to any other sales by Melimedias/Melongolia of Belgian DVDs directly to French buyers.

24.     We will now consider the damages to which Hannibal is entitled.  In this connection, Marco Polo, the French distributor of the Picture, has assigned to Hannibal, as of June 13, 2011, all of its rights in any and all causes of action, damages, and remedies against Les Films.

25.     Hannibal is seeking damages for alleged losses as to sales of Belgian DVDs and Blu-Rays in France.  However, the evidence shows that Les Films has not manufactured any Blu-Rays and thus no Belgian Blu-Rays were sold in France.  Furthermore, the evidences does not show that there was more than a marginal impact, if any, on the sale of Blu-Rays in France.

26.     Hannibal has claimed damages based on an estimated sale of 60,000 DVDs of the Picture in France during the first run. Hannibal maintains that Marco Polo was to receive a royalty of 3 Euros for each DVD unit sold in France.

27.     The evidence establishes that the first run of DVDs in France was for 32,000 units, not 60,000 units; that the return of unsold products in a first run is customarily up to 35%; and that SDO, a major French retailer, returned 67% of its DVDs to MEP as a result of the sale of Belgian DVDs into France. Furthermore, the evidence demonstrates that a second cycle of DVDs would be about 20% of the first cycle or 6,400 units. In short, MEP expected to sell 38,400 units of DVDs in the first two cycles; and in fact had sold 11,000 units by the time of the hearing in this case. That leaves 27,400 units unsold. Assuming a customary return by retailers of about one-third or 9,100 units, that would leave a maximum of 18,300 DVD units unsold as a result of the sale of the Belgian DVDs into France. Although Hannibal contends that Marco Polo was to receive a royalty of 3 Euros per DVD, the agreement between MEP and Marco Polo dated February 29, 2011 shows a royalty of 2.49 Euros per DVD. This would bring the total damages on 18,300 DVD units to 45,567 Euros.

28.     For purposes of conversion of Euros to U.S. Dollars, I am using the current conversion rate of 1 Euro equals 1.30 U.S. Dollars.

29.     The damages in favor of Hannibal must be reduced by an MEP payment of a minimum guarantee to Marco Polo of 50,000 Euros. Hannibal contends that this minimum guarantee should be reduced, in computing an offset to damages, by approximately 19,000 Euros for the cost of the French track and design of the DVD and Blu-Ray Box and the cost of authoring the DVDs and Blu-Rays, and a fee of 10% or 5,000 Euros kept by Marco Polo pursuant to the agreement, or a net offset of 24,000 Euros.

30.     Accordingly, the damages to Hannibal would be 45,567 Euros, less an offset of 24,000 Euros, or a net of 21,567 Euros or $28,037.

31.     Paragraph V(C)(6) of the Agreement provides that the prevailing party shall be entitled to "prompt payment of costs and fees including reasonable attorney's fees." Accordingly, Hannibal, as the prevailing party, is entitled to payment of its reasonable attorney's fees and its

other costs and fees. I find Martin Barab's attorney's fees as set forth in his declaration of March 15, 2012 (116 hours x $450 per hour) to be reasonable; this comes to a total of $52,200. As to the legal fees for Hannibal's attorney in France, I find the reasonable attorney's fee to be $6,000 as it relates to this arbitration. Hannibal is also entitled to its total requested arbitration costs of $14,250.

32.    In summary, Hannibal's total damages including reasonable attorney's fees and costs come to U.S. $100,487 (i.e., $28,037; $52,200; $6,000; and $14,250).

33.    Hannibal has asked that the Agreement be deemed terminated and that all material previously delivered to Les Films be returned to Hannibal. As discussed herein, we do not find that Les Films engaged in any fraudulent conduct or fraudulent conspiracy. The evidence does not establish any such fraud or any egregious conduct by Les Films. The main reason for the sales of Belgian DVDs into France appears to be the actions of Melimedias/Melongolia. Accordingly, we believe that if Les Films pays Hannibal the total amount awarded herein within 60 days after the date of this Final Award, then Les Films should have the right and opportunity to distribute the Picture in the Dutch language in the Dutch territory of Benelux, pursuant to and in accordance with the applicable terms of the Agreement, and that Hannibal shall cooperate with Les Films and furnish any and all necessary or reasonably requested materials, including but not limited to a second master in English and promotional materials, as provided under the Agreement, to facilitate the distribution of the Picture in the Dutch territory of Benelux. If, on the other hand, Les Films does not pay the total amount awarded herein within 60 days after the date of this Final Award, then the Agreement shall be deemed terminated and all material previously delivered to Les Films shall be returned by Les Films to Hannibal.

34.    Les Films has asserted counter-claims for damages in relation to the Dutch part of the territory, reputational damages, and damages for abuse of process and vexatious litigation. We find that Les Films has not proved any of these counter-claims by a preponderance of the evidence.

## **FINAL AWARD**

Based on the foregoing, the Final Award will be as follows:

1.      Respondent Les Films de L'Elysee is hereby ordered to pay Claimant Hannibal Pictures damages in the amount of U.S. $28,037 and attorneys' fees and costs of U.S. $72,450, or a total of U.S. $100,487.

2.      If Les Films pays Hannibal the total amount awarded herein within 60 days after the date of this Final Award, then Les Films shall have the right and opportunity to distribute the Picture in the Dutch language in the Dutch territory of Benelux, pursuant to and in accordance with the applicable terms of the Agreement, and Hannibal shall cooperate with Les Films and furnish any and all necessary of reasonably requested materials, including but not limited to a second master in English and promotional materials, as provided under the Agreement, to facilitate the distribution of the Picture in the Dutch language in the Dutch territory of Benelux.  If, on the other hand, Les Films does not pay the total amount awarded herein within 60 days after the date of this Final Award, then the Agreement shall be deemed terminated and all material previously delivered to Les Films shall be returned to Hannibal.

3.      This Final Award is in full settlement of all claims submitted to this Arbitration.  All claims not expressly granted herein are hereby denied.

Dated:  May 15, 2012 in Los Angeles, California.


_Sol Rosenthal_
_____
Sol Rosenthal
Sole Neutral Arbitrator

# EXHIBIT "B"

IFTA® INTERNATIONAL
## MULTIPLE RIGHTS DISTRIBUTION AGREEMENT

This International Multiple Rights Distribution Agreement is made as of November 3, 2009 between:

HANNIBAL PICTURES                                     ("Licensor")
acting as sales agent for Georgia Film Fund I
8265 Sunset Boulevard, Suite 107
West Hollywood, CA 90046
Telephone:  323-848-2945
Email: jonathan@hannibalpictures.com               Telefax:  323-848-2946

and

Les Films de L'Elysee                                ("Distributor")
1 Avenue du Chateau Jaco
1410 Waterloo - Belique
Telephone: 32 2 357 32 10
Email: bernardb@filmselysee.be                       Fax: 32 2 357 32 20

For reference purposes this Agreement is identified as follows:

### GUN

This Agreement is: [X] a new agreement; [ ] a long form agreement replaces the deal memo between Licensor and Distributor regarding the Picture; [ ] an amendment to an existing agreement between Licensor and Distributor with the same Reference Code.

Subject to timely payment of all monies due Licensor and Distributor's full performance under this Agreement, Licensor licenses exclusively to Distributor, and Distributor accepts from Licensor, the Licensed Rights in the Picture throughout the Territory for the Agreement Term in the Authorized Languages subject to the Holdback as identified below on all the terms and conditions of this Agreement.

This Agreement consists of the following parts: the Cover Page; Table of Contents; Deal Terms; Standard Terms and Conditions; Schedule Of Licensing Definitions; and the following Attachment(s): [ ] Access Letter: [ ] Form Letter Of Credit; [ ] Guaranty; [ ] Censorship Rider; and All parts of this Agreement will be interpreted together to form one Agreement. If not defined where they first appear, words used in this Agreement are defined in the Standard Terms and Conditions or in the Schedule of Licensing definitions or; if not otherwise defined in this Agreement, in accordance with industry custom and practice.

IN WITNESS WHEREOF, Licensor and Distributor have executed this Agreement as of the date first written above to constitute a binding contract between them.

HANNIBAL PICTURES INC                    LES FILMS DE L'ELYSEE
Licensor                                 Distributor

By: Richard Rionda Del Castro            By: Eric BRAWERMAN
Its: Chairman of the Board               Its: CEO

# TABLE OF CONTENTS

*Section*
**Deal Terms**                                                          *Paragraph*

    Basic License Terms                                        I.
    Licensed Rights Terms                                      II.
    Financial Terms                                           III.
    Delivery Terms                                            IV.
    Additional Terms                                          V.

**Standard Terms and Conditions**

    Definitions And Usage                                     1.
    Picture And Version                                       2.
    Licensed Rights And Reserved Rights                       3.
    Allied Rights                                             4.
    Territory and Region                                      5.
    Term and License Period                                   6.
    Payment Requirements                                      7.
    Delivery And Return                                       8.
    Exploitation Obligations                                  9.
    Music                                                     10.
    Suspension And Withdrawal                                 11.
    Default And Termination                                   12.
    Anti-Piracy                                               13.
    Licensor's Warranties                                     14.
    Distributor's Warranties                                  15.
    Indemnities                                               16.
    Assignment And Sublicensing                               17.
    Miscellaneous Provisions                                  18.

**Schedule of Licensing Definitions**

    Cinematic Rights Definitions                              A.
    Video Rights Definitions                                  B.
    Ancillary Rights Definitions                              C.
    Pay TV Rights Definitions                                 D.
    Free TV Rights Definitions                                E.
    Other Rights Definitions                                  F.
    Additional Definitions                                    G.



IFTA® INTERNATIONAL
## MULTIPLE RIGHTS DISTRIBUTION AGREEMENT

### DEAL TERMS

*Mention in these Deal Terms of any right not specifically licensed to Distributor in the Licensed Rights Terms does not grant to Distributor expressly or by implication any right not specifically licensed to Distributor in the Licensed Terms.*

### I.
### BASIC LICENSE TERMS

A.   **Picture(s):   GUN**
     Stars: Val Kilmer & Curtis "50 Cent" Jackson

  These stars are essential to the agreement.

B.   **Territory(ies): BENELUX**

C.   **Term:** Starting on execution and ending twelve (12) years from first release of Picture(s).

D.   **Authorized Language(s):**
  [X] Original Language; [X] Official Language(s) in Territory.
  All Licensed Rights may be exploited:  [X]Dubbed  [X]Subtitled

E.   **Authorized Video Use(s):  PAL/NTSC** cassette, DVD and videogram

F.   **Authorized Television Runs:**  Unlimited

  Distributor is hereby granted unlimited runs per title for the Picture(s) for On-Demand, Pay-Per-View, Pay TV and Free TV, whether broadcast via terrestrial, cable or satellite transmission is at Distributor's discretion. Distributor agrees, however, all On-Demand and satellite transmissions are to be of a dubbed and encrypted version.

G.   **Release Dates:**

  Distributor will cause the First Release of the Picture(s) throughout Territory ("First Release") to take place no later than six (6) months after Delivery of the Initial Materials. Distributor cannot exploit any Licensed Right before the end of its applicable Holdback period. Once determined, Distributor will also provide Licensor with all release dates for the Picture in the Territory.

See Additional Terms, Paragraph C.9.



II.
## EXCLUSIVE LICENSED RIGHTS TERMS

*A Right is licensed to Distributor only if the "Yes" box is marked. A Right not marked or marked in the "No" box is Reserved Right of Licensor. All Holdbacks are subject to Holdback coordination and adjustment within the Holdback Region in accordance with Paragraph 6.7 of the Standard Terms and Conditions.*

A.   **Cinematic Rights:**

| Licensed | | Holdback |
|---|---|---|
| Theatrical | [X]Yes [ ]No | See Additional Terms Paragraph C. 9. |
| Non-Theatrical | [X]Yes [ ]No | See Additional Terms Paragraph C. 9. |
| Public Video | [X]Yes [ ]No | See Additional Terms Paragraph C. 9. |

B.   **Ancillary Rights:**   * if no theatrical release in the US, no ancillary holdbacks apply

| | Licensed | Holdback |
|---|---|---|
| Airline | [ ]Yes [X]No | Until 3 months from First U.S. Theatrical Release |
| Ship | [X]Yes [ ]No | Until 3 months from First U.S. Theatrical Release |
| Hotel | [X]Yes [ ]No | Until 3 months from First U.S. Theatrical Release |

C.   **Video Rights:**

| | Licensed | Holdback |
|---|---|---|
| Home Video | [X]Yes [ ]No | Until N/A months from First Theatrical Release |
| Commercial Video | [X]Yes [ ]No | Until N/A months from First Theatrical Release |
| Sell-thru | [X]Yes [ ]No | Until N/A months from First Theatrical Release |

D.   **Television Rights:**

| | Licensed | Holdback |
|---|---|---|
| **Pay-per-View TV, including On-Demand** | | |
| Terrestrial | [X]Yes [ ]No | Until N/A months from Holdback Date |
| Cable | [X]Yes [ ]No | Until N/A months from Holdback Date |
| Satellite | [X]Yes [ ]No | Until N/A months from Holdback Date |
| **Pay TV** | | |
| Terrestrial | [X]Yes [ ]No | Until N/A months from Holdback Date |
| Cable | [X]Yes [ ]No | Until N/A months from Holdback Date |
| Satellite | [X]Yes [ ]No | Until N/A months from Holdback Date |
| **Free TV** | | |
| Terrestrial | [X]Yes [ ]No | Until N/A months from Holdback Date |
| Cable | [X]Yes [ ]No | Until N/A months from Holdback Date |
| Satellite | [X]Yes [ ]No | Until N/A months from Holdback Date |

E.   **Internet Rights:**

| | Licensed | Holdback |
|---|---|---|
| Video on Demand - Internet | [X]Yes [ ]No | See Additional Terms, paragraph C.10. |
| Pay-per-view - Internet | [X]Yes [ ]No | See Additional Terms, paragraph C.10. |



| | | |
|---|---|---|
| Pay TV - Internet | [X]Yes [ ]No | See Additional Terms, paragraph C.10. |
| Free TV - Internet | [X]Yes [ ]No | See Additional Terms, paragraph C.10. |

Holdback Date:  See Additional Terms, paragraph C.9.

## III.
## FINANCIAL TERMS

A.   Guarantee:

1.      **Amount:** US $ NINETY THOUSAND (US $90,000) net of Taxes. The minimum guarantee is a minimum net sum and no taxes or charges may be deducted therefrom. The payment is as follows:

**Installment**

| | Payment Method | |
|---|---|---|
| 10% (US $9,000) Upon Signature Long Form Agreement | [X] WT | [ ] LC |
| 10% (US $9,000) Upon Start of Principal Photography | [X] WT | [ ] LC |
| 55% (US $49,500) Upon Notice of Delivery of Original Version | [X] WT | [ ] LC |
| 25% (US $22,500) Upon Notice of Delivery of French Dubbed materials made by French distributor | [X] WT | [ ] LC |

2.      **Default:** In the event Distributor does not pay any portion of the Guarantee in respect of any Picture upon the Due Date, Licensor will provide written notice, if due payment is not executed within 14 working days, then Licensor shall be entitled in its sole and unfettered discretion to elect to:

2.1      cancel this agreement in respect of such Picture only, whereupon Licensor shall be entitled to retain any and all amounts previously paid by Distributor to Licensor in respect of such Picture by way of liquidated damages, (which the parties agree is a reasonable estimate of Licensor's damages based on Distributor's failure to perform), the rights licensed hereunder in respect of such Picture shall not pass to Distributor and Licensor shall be entitled to re-license the Picture and the Licensed Rights in respect thereof in such manner and to such parties as it may in its sole discretion deem fit; and/or

2.2      cancel this Agreement in respect of all Pictures licensed hereunder, whereupon Licensor shall be entitled to retain any and all amounts previously paid by Distributor to Licensor hereunder by way of liquidated damages, (which the parties agree is a reasonable estimate of Licensor's damages based on Distributor's failure to perform) none of the rights licensed hereunder shall pass to Distributor, any such rights which have passed to Distributor shall be deemed to have been automatically reassigned to Licensor and Licensor shall be entitled to re-license any or all of the Pictures and the Licensed Rights in such manner and to such parties as it may deem necessary to mitigate its damages hereunder; and/or

2.3      enforce this Agreement and demand payment of all amounts due hereunder.



Notwithstanding the foregoing, Licensor reserves the right to bring a cause of action, suit or claim, at law or in equity, against Distributor for any breach, default or failure by Distributor to pay any portion of the Guarantee hereunder.

3.   Allocation: *For information purpose only*
If no allocation is indicated below, then the entire Guarantee will be deemed allocated to the Theatrical Rights. Otherwise, the Guarantee will be allocated among the Licensed Rights as follows:

    a. "Cinematic Guarantee": _70_ % (US$_____)
      To the Theatrical, Non-Theatrical or Public Video Rights, as licensed.

    b. "Video Guarantee":     _15_ % (US$_____)
      To the Home Video or Commercial Video Rights, as licensed.

    c. "Ancillary Guarantee": _N/A_ % (US$_____)
      To the Airline, Ship, or Hotel Rights, as licensed.

    d. "Television Guarantee": _15_ % (US$_____)
      To the Free TV or Pay TV Rights, as licensed.

B.   **Payment Requirements:**

Timely payment of all amounts due Licensor is of the essence of this Agreement and an express condition precedent to Distributor's right to exercise or exploit any of the Licensed Rights. Except as otherwise provided herein, Distributor will make payments of the installments of the Guarantee indicated in Paragraph A.1 due Licensor as follows:

    1.   **WT - Wire transfer:**
      [X] License Fee Installments     Other Payments: _____
      Distributor will pay the indicated installments of the License Fee or other payments by wire transfer of unencumbered funds, free of any transmission charges, to the following account:

      **As Per Invoice**

C.   **Recoupment of Guarantee:**

    1.   **"Shortfall" Defined:**
      For purposes of this Agreement the "Shortfall" will be the amount by which Recoupable Distribution Costs for a Licensed Right plus the Guarantee exceed Licensor's Share of Gross Receipts for such Licensed Rights as defined in Section II.

    2.   **Allowed Cross-Collateralization:**
      A Shortfall for a Licensed Right may only be recouped from Licensor's share of Gross Receipts as defined in Section II from another Licensed Right as follows:

a. <u>100% of Licensor's Share of Cinematic Gross Receipts</u>
A Shortfall my only be recouped from this percent of Licensor's share of Cinematic Gross Receipts.

b. <u>100% of Licensor's Share of Ancillary Gross Receipts</u>
A Shortfall my only be recouped from this percent of Licensor's share of Ancillary Gross Receipts.

c. <u>100% of Licensor's Share of Video Gross Receipts</u>
A Shortfall my only be recouped from this percent of Licensor's share of Video Gross Receipts.

d. <u>100% of Licensor's Share of Pay TV Gross Receipts</u>
A Shortfall my only be recouped from this percent of Licensor's share of Pay TV Gross Receipts.

e. <u>100% of Licensor's Share of Free TV Gross Receipts</u>
A Shortfall my only be recouped from this percent of Licensor's share of Free TV Gross Receipts.

If this formula is insufficient to recoup any Shortfall the unrecouped Shortfall must be borne by Distributor.

D.   **Disposition of Gross Receipts:**

1.   **Costs-Off Deal:**
Distribution will make continuing payments and recoupments in the following order of priority from the Gross Receipts for each of the following Licensed Rights:

       [X] <u>All Cinematic Licensed Rights</u>
       [X] <u>All Ancillary Licensed Rights</u>      [ ] <u>All Pay TV Licensed Rights</u>
       [ ] <u>All Video Licensed Rights</u>        [ ] <u>All Free TV Licensed Rights</u>

Payments and recoupments apply separately to each Licensed Right.

a. <u>Recoupment of Recoupable Distribution Costs.</u>
50% of first Gross Receipts to recoup Recoupable Distribution Costs.
50% of first Gross Receipts to **Distributor**.

b. <u>Sharing after Recoupable P&A, until Guarantee; If Any; Recouped:</u>
<u>50%</u> of remaining Gross Receipts to recoup **Guarantee** until 100% of applicable Guarantee, if any, recouped.

<u>50%</u> of remaining Gross Receipts to **Distributor** until 100% of applicable Guarantee, if any, recouped.

c. Sharing After Guarantee Recouped or Sharing If No Guarantee:

50% of remaining Gross Receipts to **Licensor**.

50% of remaining Gross Receipts to **Distributor**.

(Next Distributor will pay to Licensor, and may retain for itself, for each designated Licensed Right the indicated percentages of its Gross Receipts left after recoupment of its Guarantee, or, if there is no Guarantee, after recoupment of its Recoupable Distribution Costs.

2. **Free TV and Pay TV Deal (Including PPV and VOD):**
Distributor will make continuing payments and recoupments in the following order of priority from the Gross Receipts derived for each of the following designated Licensed Rights:

[   ] All Cinematic Licensed Rights
[   ] All Ancillary Licensed Rights          [X] All Pay TV Licensed Rights
[   ] All Video Licensed Rights              [X] All Free TV Licensed Rights

The following payments and recoupments apply separately to each designated Licensed Right.

a. Recoupment of Recoupable Distribution Costs:
100% of All Gross Receipts go to **Distributor** for recoupment of recoupable distribution costs if not recouped by Distributor from Theatrical release.

*It being agreed that Distribution will keep its 40% commission and recoup the recoupable Distribution costs out of 60% (Licensor's share)*

(Next Distributor may use for each designated Licensed Right the indicated percentage of Gross Receipts for that Licensed Right to recoup the Recoupable Distribution Costs.)

b. Recoupment of Guarantee:
100% of Guarantee recouped by **Distributor** from all gross receipts if not recouped by Distributor from Theatrical release.

*It being agreed that Distribution will keep its 40% commission and recoup the Guarantee out of 60% (Licensor's share)*

(Distributor may retain for each designated Licensed Right all Gross Receipts left after recoupment of Recoupable Distribution Cost until the indicated percentage of the Guarantee is recouped for that Licensed Right.)

c. Sharing After Guarantee Recouped:
60% of remaining Gross Receipts to **Licensor**.
40% of remaining Gross Receipts to **Distributor**.

(Distributor may pay to Licensor, and may retain for itself, for each designated Licensed Right the indicated percentages of Gross Receipts left after recoupment of the Recoupable Distribution Costs and the Guarantee, if any, for that Licensed Right.

3. **Video Royalty Deal:**

Distributor will make the following continuing payments and recoupments in the following order of priority from the Gross Receipts derived for the Video Licensed Rights designated below. All payments and recoupments apply separately to each designated Licensed Right.

a. Recoupment of Recoupable Distribution Costs. *It being agreed that Distribution will keep its 50% commission and recoup out of 75% (Licensor's share)*

100% of All Gross Receipts go to **Distributor** for recoupment of recoupable distribution costs if not recouped by Distributor from Theatrical release.

b. Recoupment of Guarantee. *It being agreed that Distribution will keep its 25%, commission and recoup the Guarantee out of 75% (Licensor's share)*

100% of Guarantee recouped by **Distributor** from all Gross receipts is not recouped by Distributor from theatrical release.

(Distributor may recoup from Licensor's royalty for each Video Licensed Right designated above the indicated percentage of the Guarantee allocated to the Video Licensed Rights).

c. Licensor's Royalty After Guarantee Recouped:

25% of remaining Home Video Rental Receipts to **Licensor**.
75% of remaining Home Video Rental Receipts to **Distributor**.
15% of remaining Home Video Sell Thru Gross Receipts to **Licensor**.
85% of remaining Home Video Sell Thru Gross Receipts to **Distributor**.
25% of remaining Commercial Video Gross Receipts to **Licensor**.
75% of remaining Commercial Video Gross Receipts to **Dsitributor**

(Distributor will pay Licensor for each designated Licensed Right the indicated percentages of Gross Receipts remaining after recoupment of the portion of the Guarantee, if any, allocated to the Video Licensed Rights.)

## IV.
## DELIVERY TERMS

1. **Physical Materials:**
   [X] To be specified in Licensor's Notice of Initial Delivery per Paragraph 8; or
   [  ] The following items delivered per Paragraph 8 of the Standard Terms And Conditions:

2. **Support Materials:**
   [X] To be specified in Licensor's Notice of Initial Delivery per Paragraph 8; or
   [  ] The following items delivered per Paragraph 8 of the Standard Terms And Conditions:
   Flyers, Posters, Dialogue Book, Music Cue Sheet, Key art, slides.

3. **Date for Notice of Initial Delivery:**
   Licensor will give Distributor a Notice of Initial Delivery no later than:
   [X] Promptly after the Picture is ready for Delivery.

4. **Materials Payment Instructions:**
   Distributor will pay for all Materials:



[ ] To be specified in Licensor's Notice of Initial Delivery per Paragraph 8; or
[X] As follows: Distributor will pay Licensor for all material upon Notice of Delivery.

5.   **Materials Shipping Instructions:**
Licensor will ship all Materials to Distributor:
[ ] To be specified in Licensor's Notice of Initial Delivery per Paragraph 8; or
[X] As follows: At Distributor sole cost. Using Distributor's Express Courier Account.

6.   **French Dubbed Materials:**
[X] French Dubbed Materials to be defined as DA-88 Synchro to Digibeta 16X9 of French Track. In case the French dubbed material (the Da-88 Synchro to Digibeta 16X9 of the French Track) will not be available at the latest 6 months after NOD of original version the 25% (US$ 22 500) due upon notice of delivery of French dubbed material (DA-88 Synchro to Digibeta 16x9 of French Track) will not be due any more and the distributor will be authorized to create his own french dubbed material.

## V.
## ADDITIONAL TERMS

A.   **Governing Law:** State of California, USA

B.   **Forum:** County of Los Angeles, California

C.   **Additional Deal Terms:**

1.      Licensor and/or its designees will at all times have unimpeded and free access to all foreign language tracks (regardless of format), all dubbed versions (whether on film or videotape), all subtitled versions (whether on film or videotape), all masters, all advertising and promotional materials, all artwork, and all other materials created by Distributor pursuant to this Agreement.

2.      Distributor has the obligation to display visibly and prominently Licensor's trademark and/or logo which shall never be smaller nor less visible than any other trademark and/or logo appearing at the beginning or end of the program, in any display, stills, posters, jackets, and any other marketing material related to the Program. Failure to comply with this obligation shall be deemed as a breach of this Agreement.

3.      If the Picture(s) is to be released theatrically in the Territory, then Licensor shall have the right to consult on the legal credit obligations.

4.      Distributor agrees to sign a Notice of Assignment for the Picture(s).

5.      The right to receive all monies collected by any collecting society, author's rights organization, performing rights society or governmental agency that are payable to authors, producers, performers or other persons and that arise from royalties, compulsory licenses, cable retransmission income, music performance royalties, tax rebates, exhibition surcharges, levies on



blank videograms or hardware, rental or lending royalties, or the like, are specifically reserved to Licensor, and will, as between Licensor and Distributor, be the sole property of Licensor, and will not be included in or credited to any Gross Receipts. Licensor has the sole right to collect any and all such amounts, and if any such amounts are paid to Distributor, then Distributor shall immediately remit same to Licensor with a statement identifying the payment.

6.      This Agreement (and each of the Schedules and Exhibits attached hereto, if any) is entered into pursuant to the laws of the State of California, USA and shall be interpreted in accordance with the laws applicable to agreements entered into and wholly performed therein. Each of the parties hereto agree that any dispute arising under this Agreement, including, without limitation, any dispute relating to Delivery or Distributor's obligation to make payment hereunder, or the Assignment referred to in the Deal Terms  or in the Standard Terms and Conditions or any Schedule or Exhibit hereto shall be resolved by mandatory binding arbitration under the Rules of International Arbitration of IFTA in effect as of the date the request for arbitration is filed (the "Rules") (or, in the event that in the future IFTA is not in the business of conducting such arbitrations, the arbitration rules of any successor international film marketing association based in Los Angeles which provides arbitration procedures, or, if none, the rules of the American Arbitration Association). Any of Licensor, Distributor, or Designated Bank may initiate such an arbitration pursuant to the Rules and such arbitration will be held in Los Angeles, California (the "Forum"). The parties agree to abide by the decision rendered in such arbitration and that any court having jurisdiction may enforce such decision. The parties hereby submit to the exclusive jurisdiction of the courts of the Forum in all matters relating to such arbitration. The parties agree to accept service of process for all proceedings in accordance with the Rules and to accept service of process for any judicial or other process by registered mail. Distributor hereby expressly waives application of the procedures for service of process pursuant to the Hague Convention for Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.   The prevailing party in any such action shall be entitled to prompt payment of costs and fees including reasonable attorney's fees.

7.      Assignment: Licensor shall have the right, exercisable at any time, to freely assign, transfer or sublicense any of its rights, or delegate any of its obligations or duties, under this Agreement to any person, company or entity. Notwithstanding the foregoing, Licensor shall remain secondarily liable with respect to its obligations and liabilities to Distributor hereunder unless such assignment or transfer is (a) to an entity with which Licensor merges or consolidates, or which acquires all or substantially all of the assets of Licensor; or (b) to Licensor's predecessor-in-interest with respect to the Film, in which case, such assignment or transfer shall relieve Licensor from its obligations and liabilities to Distributor under this Agreement and Distributor shall look solely to such assignee or transferee with respect to the performance and satisfaction of all such obligations and liabilities. Any assignment or transfer of the type described in clauses (a) or (b) above shall be effective immediately upon receipt of written notice from Licensor. Distributor shall not have the right to assign this Agreement without the prior written consent of Licensor.

8.      Security Interest : Concurrent with the execution hereof, Distributor hereby grants to and in favor or Licensor a security interest in and to all Licensed Rights hereunder and the proceeds derived from the exploitation thereof.  Distributor shall provide any and all documentation



reasonably required by Licensor in order to give effect hereto and in the event of the failure or refusal of Distributor to execute any such documents, Distributor hereby appoints Licensor as its attorney in fact, which appointment is deemed coupled with an interest, for the purposes of executing any such documents as may be necessary to give effect to the security interest herein granted.

9.      In the event the Picture has a Release in the United States by a distributor ("US Distributor"), and in the event the US Distributor requires a holdback of any of the Licensed rights in the Territory, then Distributor shall comply with any such holdback.

10.     **Internet Rights:** If Internet Rights are granted, Distributor may exploit the Picture using the IP Protocol for broadband transmission provided, however that any such method of exploitation conforms to the following conditions:

(i)      Distributor shall provide and maintain exclusive access to the Picture to individuals in private homes ("Users") for the purposes of viewing the Picture on a computer screen, terminal or TV via broadband transmission following either: (a) payment of a fee for such access, or (b) verification of previous payment for services where such access to the Picture is inclusive in the User's contract with Distributor (i.e., Satellite or Cable TV account);

(ii)     The date file containing the Picture must be encrypted using the latest and most secure form of encryption technology available for online media access;

(iii)    Distributor shall restrict User's access to the most current and secure encrypted "streaming-only" technology or, if the Picture is made available for download, Distributor shall ensure that the Picture is encoded with the most current and most secure encryption technology available in the Territory and the Users shall only be provided access to view the Picture via a proprietary software viewer or viewer with security of the highest and most current industry-accepted levels of security and resistance to "pirating", "hacking", "cracking" or any other form of security circumvention now known or hereafter devised;

(iv)     Distributor shall ensure that such delivery shall be limited to Users located within the Territory;

(v)      The Picture shall be in the Authorized Languages only;

(vi)     Distributor shall ensure that once a Picture is viewed by a User, said Picture shall not be in such a format on the User's computer, set-top box or terminal as to allow the User to share, trade, upload, burn, copy or otherwise move or transfer any of said Picture to another location so that said Picture can be viewed by any other individual or User with no previous access to the specific Picture in question;

(vii)    Licensor and Distributor shall share the Gross Receipts derived from the exploitation of the TV and Demand View Rights in the same manner as traditionally delivered TV and Demand View.

# IFTA™ INTERNATIONAL STANDARD TERMS
## FOR OUTRIGHT DEALS

1. **DEFINITIONS AND USAGE**

1.1. **Definitions:** Words and phrases with initial letters capitalized are Defined Terms. If not defined where they first appear, they are defined in the attached Schedule of Definitions which is incorporated by reference and is part of this Agreement. The reference in any provision herein to rights not specifically licensed in the Deal Terms is for convenience only and does not grant Licensee any such rights.

1.2. **Usage:** If more than one Picture is licensed to Licensee in the Deal Terms, then all

provisions of this Agreement apply to each Picture individually unless specifically provided otherwise in this Agreement.

2. **PICTURE AND VERSION**

2.1. **Picture:** The Picture is the Motion Picture currently identified in the Deal Terms. Licensor may change the title of the Picture.

2.1.1. **Version:** The Picture is only licensed in linear form for viewing from beginning to end. Licensor reserves all rights in all Versions of the Picture other than its original linear form as Delivered to Licensee and the authorized dubbed, subtitled or edited Versions made by Licensee. If during the Agreement Term Licensor elects to exploit another Version of the Picture in the Territory that incorporates a substantial portion of the linear form of the Picture licensed to Licensee, then Licensor will accord Licensee a right of First Negotiation to acquire any affected Licensed Rights in such Version for the remainder of the License Period for such Licensed Rights. If Licensee does not acquire the affected Licensed Rights in such new Version, then Licensor may exploit such new Version(s) in the Territory starting six (6) months after the end of any Holdback for the affected Licensed Rights.

3. **LICENSED RIGHTS AND RESERVED RIGHTS**

3.1. **License:** Subject to the terms of this Agreement, Licensor exclusively licenses to Licensee the Licensed Rights in the Picture for their respective License Periods throughout the Territory for exploitation only by the Authorized Language Use(s), for the Authorized Format(s), on the Licensed Channel(s), for no more than the Licensed Telecast(s), and subject to all Use Restrictions set forth in the Deal Terms.

3.2. **Vesting:** Each Licensed Right will only vest in Licensee after the following is met in accordance with the Deal Terms: (i) Licensee accepts Initial Delivery of the Picture; and (ii) Licensee pays Licensor the entire License Fee.

3.3. **Reservation:** All rights not expressly licensed to Licensee in the Deal Terms are Reserved

Rights. Licensor may exploit all Reserved Rights without restriction except as expressly provided in this Agreement.

3.4. **Reversion:** Each Licensed Right will immediately revert to Licensor free of any claim by Licensee or other Person on the earlier of the end of the License Period for the Licensed Right, the end of the Agreement Term under Paragraph 6.1., or cancellation under Paragraph 12.2.

3.5. **Exclusivity Limitations:**

3.5.1. Broadcast Overspill: Licensor does not grant exclusivity protection against reception in the Territory of a broadcast or Simultaneous Retransmission of the Picture originating outside the Territory, whether terrestrial, cable or satellite. Licensor only agrees, subject to Paragraph 3.5.4. that during the License Period for any PayPerView, Pay TV or Free TV Licensed Rights it will not broadcast or authorize broadcast of the Picture in any

Authorized Language within the Region where the broadcast is intended for primary reception within the Territory.

3.5.2. Parallel Imports: Licensor does not grant exclusivity protection against sale or rental in the Territory of Videograms embodying the Picture imported from outside the Territory. Licensor only agrees, subject to Paragraph 3.5.4., that during the License Period for any Video Licensed Right it will not sell or authorize sale of Videograms embodying the Picture in any Authorized Language within the Region where those Videograms are intended for primary consumer sale or rental within the Territory.

3.5.3. Internet Availability: Licensor does not grant exclusivity protection against the

availability of the Picture on the Internet within the Territory. Licensor only agrees, subject to Paragraph 3.5.4., that until the end of the Holdback for any Video Licensed Rights, Licensor will not authorize making the Picture available on the Internet in any Authorized Language for Downloading at reasonably identifiable locations in the Territory.

3.5.4. Original Version: Unless English is an official language in the Territory, Licensor's

agreement in the second sentence of each of the previous three subparagraphs does not apply to the original, unsubtitled English language version of the Picture even if English is an Authorized Language.

4. **ALLIED RIGHTS**

4.1. **Credit And Advertising:** When exploiting the Picture, Licensee will comply at all times after their receipt with all required screen credits, paid advertising, publicity and promotional requirements, name and likeness restrictions, and Videogram packaging credit requirements (if needed) as supplied by Notice from Licensor. Upon Licensor's request, Licensee will promptly submit to Licensor all advertising materials used by Licensee so that Licensor can determine whether its requirements are being met.

4.2. **Dubbing, Subtitling And Editing:** Licensee may not create dubbed, subtitled or parallel track versions of the Picture unless they are Authorized Language Uses in the Deal Terms. When creating any authorized dubbed, subtitled or edited version of the Picture or its trailers, Licensee will comply, at all times after their receipt, with all dubbing, subtitling or editing requirements for the Picture or its trailers, which are supplied by Notice from Licensor. *Except* as expressly provided in this Agreement, the Picture and its trailers must be exhibited at all times in their original continuity, without

alteration, interpolation, cut or elimination.

4.3. **Exercise Of Allied Rights:** Subject to Licensor's requirements under Paragraphs 4.1. and 4.2. and the provisions of this Agreement, Licensee will have the non-exclusive right at its sole expense:

4.3.1. To advertise, publicize, and promote the exploitation of the Licensed Rights in the

Picture in the Territory, and in so doing to use the title of the Picture, the advertising and promotion materials supplied by Licensor or created by Licensee under this Agreement, and the name, voice and likeness of any Person rendering materials or services on the Picture but not as an endorsement for any product or service other than the Picture;

4.3.2. To include before the beginning or after the end of the Picture the credit or logo of Licensee;

4.3.3. To change the title of the Picture after first obtaining Licensor's Notice of approval;

4.3.4. To dub or subtitle the Picture but only in the Authorized Language(s); and

4.3.5. In exploiting any Free TV Licensed Rights, to agree to a broadcaster's insertion of commercial announcements in the Picture but only at those points reasonably designated by Licensor.

4.4. **Limitations**: In exercising Allied Rights, Licensee may not: (i) alter or delete any credit, logo, or copyright, patent or trademark notice appearing on the Picture; (ii) include any advertisements or other material before, during or after the Picture other than the credit or logo of Licensee, an approved anti-piracy warning, or commercials as authorized in this Agreement; or (iii) alter or delete any Rights Management Information appearing on any Copy of the Picture supplied by Licensor without prior Notice of Licensor's approval, or (iv) alter, substitute, dub or delete any music or lyrics without prior Notice of Licensor's approval.

4.5. **No Inadvertent Failure**: An inadvertent failure on behalf of Licensee to comply with any requirements provided under Paragraphs 4.1. and 4.2. will not be a material breach of this Agreement *provided that* Licensee takes all reasonable efforts to cure prospectively such failure after Notice from Licensor.

## 5. TERRITORY AND REGION

5.1. **Territory**: The Territory means the countries or territories listed in the Deal Terms, as further defined in the IFTA™ International Schedule of Suggested Territories and Regions, and as their political borders exist on the Effective Date of this Agreement.

5.2. **Non-Contiguous Areas**: Non-Contiguous Areas mean embassies, military and government installations, oil rigs and marine drilling sites, airlines-in-flight and ships-at-sea flying the flag of a country but not located within its contiguous geographic borders. The Territory does not include the Non-Contiguous Areas of other foreign countries located within the Territory. However, for the Non-Theatrical, Commercial Video, Airline and Ship Licensed Rights, the Territory includes the Non-Contiguous Areas of each country in the Territory as necessary for exploiting such Rights.

5.3. **Changes In Borders**: If during the Agreement Term an area separates from a country in the Territory then the Territory will still include the entire area which formed one political entity as of the Effective Date of this Agreement. If during the Term an area is annexed to a country in the Territory, then Licensor grants Licensee a right of First Negotiation to acquire the Licensed Rights in the Picture through the end of the Agreement Term in the newly annexed area to the extent said rights are then or become available.

5.4. **Region**: The Region is the part of the world in which the Territory is located. The Region is defined either in the Deal Terms or as otherwise in the IFTA™ International Schedule of Suggested Territories and Regions current as of the Effective Date of this Agreement.

5.5. **Regionalization**: The Picture is only licensed for exploitation using the technological methods in customary commercial use in the Territory during the Agreement Term. For example, if PAL is the customary commercial format for Videograms in the Region, then in exercising any Video Licensed Rights Licensee may only exploit Videograms of the Picture in the PAL format. If the Video Licensed Rights include DVD as an Authorized Format, then Licensee may only exploit Videograms of the Picture in the local encoded DVD regional format.

LF639; LF640

5.6. **Changes In Licensed Channel**: Licensee may only telecast or authorize telecast of the Picture over the originating transmitting facilities of the Licensed Channel designated in the Deal Terms as it exists on the Effective Date of this Agreement. If there is a physical change in the facilities of the Licensed Channel that materially affects the number or kind of household televisions capable of receiving it (*e.g.* signal boost, new transponder, satellite orbital drift), then Licensee will promptly give Licensor Notice of such change. Licensor grants Licensee a right of First Negotiation regarding exploitation of any affected Licensed Rights over such new facilities, taking into account rights previously granted to other Persons and an adjustment in the License Fee. If no agreement is reached in the First Negotiation period, Licensor may withdraw the Picture under Paragraph 11.

## 6. AGREEMENT TERM, LICENSE PERIOD AND HOLDBACKS

6.1. **Agreement Term**: The Agreement Term starts and ends on the dates set forth in the Deal Terms *except* in case of extension per Paragraph 11. or early termination per Paragraphs 11. or 12.

6.2. **License Period**: The License Period is the maximum time period in the Deal Terms during which Licensee may exploit or authorize the exploitation of each Licensed Right. The License Period for any Pay TV or Free TV Licensed Rights ends on the *earlier* of the end of the License or the conclusion of the last Licensed Telecast. Failure to use all Licensed Telecasts will not extend the License Period. Licensee may not exploit or authorize exploitation of any Licensed Right after the end of the Agreement Term.

6.3. **First Release**: First Release means the earliest of: (i) the Outside Release Date designated in the Deal Terms, if any; or (ii) the date on which the Picture is actually first made generally available to the paying public in the Territory, either through exhibition in cinemas, sale of Videograms, or telecast; or (iii) six (6) months after Notice of Initial Delivery.

6.4. **Licensee Holdbacks**: Licensee may not exploit or authorize exploitation of any Licensed Right until the end of its Holdback. However, Licensee may enter into agreements at any time to exploit a Licensed Right starting after the end of its Holdback.

6.5. **Licensor Holdbacks**: Licensor may not exploit or authorize exploitation in the Territory of any Reserved Right until the end of its Holdback. However, Licensor may enter into agreements at any time to exploit a Reserved Right in the Territory starting after the end of its Holdback.

6.6. **Holdback Coordination**: Licensor may extend any Holdback by up to three (3) months *provided that* Licensor gives Licensee prompt Notice of any adjusted Holdback period no later than three (3) months before the end of the original Holdback period.

6.7. **Use Restrictions**: Licensee may not exploit or authorize exploitation of any Licensed Right contrary to any Use Restriction in the Deal Terms. If DVD is an Authorized Format, then Licensee may not to the extent permitted by Law, sell or authorize sale of DVDs incorporating the Original Language Version of the Picture Parallel Tracked with any other Authorized Language Version until three (3) months after Original Language DVD Versions are made available for sale to the public in any country in the Region where the Original Language of the Picture is a primary language or, if there is no such country in the Region, in the country of origin of the Picture.

## 7. PAYMENT REQUIREMENTS

7.1. **Timely Payment:** Timely payment is of the essence of this Agreement. Payment will only be considered made when Licensor has immediate and unencumbered use of funds in the required currency in the full amount due. Licensee will use diligent efforts to obtain promptly all permits necessary to make all payments to Licensor.

7.2. **License Fee:** Licensee will pay each installment of the License Fee to Licensor in the time and manner specified in the Deal Terms. Where an installment is payable on events within Licensor's control, *e.g.* the start of Principal Photography, Licensor will give Licensee timely Notice of such event. Where an installment is payable on events within Licensee's control, *e.g.* First Release, Licensee will give Licensor timely Notice of such event.

7.3. **Limits on Deductions:** There will be no deductions from any payments due Licensor because of any bank charges, conversion costs, sales use or VAT taxes, "kontingents", quotas or any other taxes, levies or charges unless separately agreed to in a Notice from Licensor.

7.4. **Blocked Funds:** If any Law prohibits remittance from the Territory of any amounts to Licensor, then Licensee will give Licensor prompt Notice of such Law. Licensee will deposit such amounts in Licensor's name for Licensor's unencumbered use in a suitable depository designated by Licensor without any deductions for so doing.

7.5. **Finance Charge On Late Payments:** Any payment not made when due will, in addition to any other right or remedy of Licensor, incur a finance charge at the lesser of three base points over the 3-month London Inter Bank Offered Rate ("LIBOR+J") on the date payment was due or the highest applicable legal contract rate. This finance charge will accrue from the date the payment was due until it is paid in full.

7.6. **Exchange Rate Provisions:** For a late payment Licensor will be entitled to the most favorable exchange rate between the due date and the payment date. The risk of devaluation of the Base Currency designated by Licensor is Licensor's sole risk; the risk of the devaluation of the currency of the Territory is Licensee's sole risk.

7.7. **Royalty Income:** All amounts collected by any collecting society, authors' rights organization, performing rights society or governmental agency arising from compulsory licenses, cable retransmission income, music performance royalties, tax rebates, exhibition surcharges, levies on blank Videograms or hardware, rental or lending royalties, or the like, will as between Licensor and Licensee be the sole property of Licensor. Licensor has the sole right to apply for and collect all these amounts. If any of such amounts are paid to or collected by Licensee, then Licensee will immediately remit them to Licensor with an appropriate statement identifying the source.

7.8. **No Cross-Collateralization:** No payment for the Picture may be cross-collateralized with or set-off against any amounts for any other Motion Picture licensed to Licensee.

## 8. DELIVERY AND RETURN

8.1. **Terminology:** "Delivery" of a Picture means delivery to Licensee of the Delivery Materials, consisting of the Initial Materials and the Additional Materials, by means of the Delivery Methods, as provided in the Deal Terms and this Paragraph 8. Initial Delivery means delivery of the Initial Materials. Additional Delivery means delivery of the Additional Materials.

8.2. **Initial Delivery:** Licensor will make Initial Delivery as follows:

8.2.1. Notice of Initial Delivery: Licensor will commence the Delivery process by giving Licensee a Notice of Initial Delivery stating the date on which Licensor is prepared to make Initial

LF639; LF640

Delivery. Such date must be no later than the Delivery Date in the Deal Terms, unless the Delivery Date is extended due to Force Majeure, but in any case no later than the Outside Delivery Date in the Deal Terms.

8.2.2. Identified Initial Materials: If the Initial Materials are identified on the Delivery Manifest or in the Delivery Deal Terms, then the Notice of Initial Delivery must also specify: (i) any Material Charges for the Initial Materials; (ii) the carrier making delivery; (iii) any delivery costs; and (iv) the method of payment. Licensee will immediately pay all amounts required. Upon receipt of payment, Licensor will immediately make Initial Delivery to Licensee of all Initial Materials by the required Delivery Method.

8.2.3. Non-Identified Initial Materials: If the Initial Materials are not identified on the Delivery Manifest or in the Delivery Deal Terms, then Licensor's Notice of Initial Delivery will identify the available Initial Materials. Within ten (10) days of receipt of Licensor's Notice Licensee will inform Licensor of the pre-print items, prints, trailers, advertising and promotional accessories, support items and other Initial Materials relating to the Picture that Licensee reasonably requires. Licensor will then give Licensee Notice of: (i) any Material Charges; (ii) the carrier making delivery; (iii) any delivery costs; and (iv) the method of payment. Licensee will immediately pay all amounts required. Upon receipt of payment, Licensor will immediately make Initial Delivery to Licensee of all Initial Materials by the required Delivery Method.

8.2.4. Licensee Acceptance: Licensee will respond promptly to Licensor's Notice of Initial Delivery so as not to delay the delivery process. In all cases, Licensee must accept Initial Delivery of all Initial Materials pursuant to the Delivery Manifest and no later than two (2) months after receipt of Licensor's Notice of Initial Delivery.

8.3. **Additional Delivery:** After completion of Initial Delivery, Licensor will give Licensee Notice that Licensor is prepared to make Additional Delivery. If the Additional Materials are identified in the Deal Terms or on the Delivery Manifest, Licensor's Notice will identify them; otherwise, Licensee will inform Licensor of the Additional Materials Licensee reasonably requires. Once the Additional Materials are identified, Licensor will inform Licensee of: (i) any Material Charges for the Additional Materials; (ii) the carrier making delivery; (iii) any delivery costs; and (iv) the method of payment. Licensee will immediately pay for such Additional Materials upon receipt of Licensor's Notice. Upon receipt of payment, Licensor will make prompt Delivery of the Additional Materials to Licensee as specified in the Deal Terms or Licensor's Notice.

8.4. **Delivery Methods:** Licensor will make Delivery of physical materials by one of the following methods specified in the Deal Terms or Licensor's Notice of Initial Delivery or Additional Delivery:

8.4.1. Physical Delivery: Where *Physical Delivery* is specified, Licensor will deliver to the delivery location specified in Paragraph I.V.D. of the Deal Terms, the physical materials suitable for use as or for the manufacture of necessary exploitation materials listed on the Delivery Manifest. Unless otherwise specified in the Deal Terms, the physical materials will be shipped to Licensee by air transport.

8.4.2. Laboratory Access: Where *Laboratory Access* is specified, Licensor will provide Licensee with access to the physical materials suitable for use as or for the manufacture of necessary exploitation materials listed on the Delivery Manifest. Access will be on the terms of the IFTA™ International Access Letter or if specified by Licensor, another mutually approved access letter. The physical materials will always be held in a recognized laboratory or facility in Licensor's name and subject

to the requirements of the IFTA™ International Access Letter or another mutually approved letter. Licensee may order prints and other exploitation materials for the Picture to be manufactured from the accessible physical materials at Licensee's sole expense.

8.4.3. Loan of Materials: Where *Loan Of Materials* is specified Licensor will deliver on loan to the delivery location specified in Paragraph IV.D. of the Deal Terms or on the Delivery Manifest the physical materials suitable for manufacture of necessary preprint materials. Unless otherwise specified in the Deal Terms, the physical materials will be shipped to Licensee by air transport. These physical materials will only be used to make new preprint materials, at Licensee's sole expense, from which necessary exploitation materials can be made. These physical materials will always be held in a laboratory or facility subject to Licensor's reasonable approval and will be returned to Licensor within a reasonable time designated by Licensor.

8.4.4. Satellite Delivery: Where *Satellite Delivery* is specified, Licensor will deliver the physical materials listed in the Deal Terms or on the Delivery Manifest to Licensee by satellite transmission consistent with available materials and Licensee's equipment. Licensor will be responsible for all uplinking transmission costs; Licensee will be responsible for arranging to receive the satellite reception and for all downlinking reception costs. Licensee's failure to make suitable downlinking receiving arrangements, or failure to receive a transmission of the Picture due to technical downlink or reception failure, will not affect Licensee's obligations under this Agreement. If Licensee experiences a technical failure of transmission or reception, Licensor upon receipt of timely Notice will attempt to assist Licensee to receive a new transmission. Licensee will pay for each missed satellite feed a charge equal to Licensor's actual cost of the uplinking transmission.

8.4.5. Electronic Delivery: Where *Electronic Delivery* is specified Licensor will deliver the physical materials listed in the Deal Terms or on the Delivery Manifest to Licensee by electronic transmission over the Internet or comparable service consistent with available materials and Licensee's equipment. When using Electronic Delivery Licensor may require Licensee to obtain and use reasonable and commercially available Rights Management Information software and anti- piracy protection as a condition for making any electronic delivery.

8.5. Delivery Of Support Material: Licensor will also provide, at Licensee's request and expense, the advertising, promotional and other support materials as specified on the Delivery Manifest or Licensor's Notice of Initial Delivery. Unless otherwise specified in the Deal Terms, all such materials will be shipped to Licensee by air transport. If Licensee elects not to use materials supplied by Licensor or a portion thereof, then Licensee will obtain prior Notice of Licensor's approval before using any of its own servicing, advertising, promotional or other support material.

8.6. Evaluation And Acceptance: Licensee will evaluate all Delivery Materials for technical acceptance promptly after their receipt. All Delivery Materials will be considered technically satisfactory and accepted by Licensee unless within fifteen (15) days after receipt Licensee gives Licensor Notice specifying any technical defect. If Licensee's Notice is accurate, then Licensor will, at its election, either: (i) promptly correct the defect and redeliver the affected Delivery Materials; or (ii) promptly deliver replacement Delivery Materials; or (iii) exercise its rights of suspension or withdrawal pursuant to Paragraph 11. In case of a redelivery, the procedures in this Paragraph will continue until Delivery is deemed made or the Picture is withdrawn. If Licensee has undertaken a First Release of the

LF639; LF840

Picture then any alleged defect will be deemed waived by Licensee.

8.7. Ownership Of Delivery Materials: Legal ownership of and title to all Delivery Materials will remain with Licensor subject to Licensee's right to use such Delivery Materials under this Agreement. Licensee will exercise due care in safe-guarding all Delivery Materials and will assume all risk for their theft or damage while they are in Licensee's possession.

8.8. Payment For Delivery Materials: Licensee will pay for all Delivery Materials as indicated in the Deal Terms or otherwise by Notice from Licensor. All costs of Delivery and return (including shipping charges, import fees, duties, brokerage fees, storage charges and related charges) will be Licensee's sole responsibility *unless* otherwise specified in the Deal Terms.

8.9. Licensee Created Materials: Licensee will provide Licensor and its designees with immediate unrestricted free access to all alternate language tracks, subtitled tracks and dubbed versions, masters, advertising and promotional materials, artwork and other materials created or authorized by Licensee to exploit the Picture ("Licensee Created Materials") for use by Licensor and/or its designees. Licensee will promptly give Licensor Notice of each Person who prepares any Licensee Created Materials and each laboratory or facility where they are located. Licensor will pay Licensee promptly on request for the actual cost of duplication and shipping to Licensor of any Licensee Created Materials and any reuse fees applicable to their use. Licensee assigns to Licensor, and Licensor will immediately become the owner of the worldwide copyright in all Licensee Created Materials, subject to a non-exclusive free license in favor of Licensee to use them during the Agreement Term solely for exploitation of the Licensed Rights. If such ownership is not allowed under a Law in the Territory then Licensee grants Licensor a non-exclusive free license to use all Licensee Created Materials worldwide in perpetuity without restriction.

8.10. Return Of Materials: When the Agreement Term ends, Licensee will at Licensor's election either: (i) return all Delivery Materials and Licensee Created Materials to Licensor at Licensee's expense; or (ii) destroy all Delivery Materials and Licensee Created Materials and provide Licensor with a customary certificate of destruction.

9. EXPLOITATION OBLIGATIONS

9.1. Video Format Approval: Licensee at its cost will provide Licensor for its reasonable approval one (1) prototype copy of each authorized type of Videogram and its packaging promptly after their manufacture and before their sale or disposition. Licensor's approval will be deemed given if Licensor does not give Licensee Notice of an objection within one (1) month of receipt of these items. The Videograms manufactured by Licensee will meet quality standards at least comparable to other Videograms commercially available through legitimate outlets in the Territory. Licensee will not advertise or authorize advertising of the availability of Videograms of the Picture to the public until two (2) months before the end of the applicable Video Holdback.

9.2. Video Sell-Off Period: During the last six (6) months of the License Period for the Video Licensed Rights, Licensee will not manufacture Videograms in excess of those reasonably anticipated to meet normal customer requirements. During the three (3) month period following the end of the License Period for the Home Video Licensed Rights, and provided this Agreement has not been terminated under Paragraphs 11. or 12., Licensee will have the non-exclusive right to sell off its then existing inventory of Videograms for Home Video exploitation only. At the end of this three (3) month period, Licensee will at

LF639; LF640

Licensor's election either sell its remaining Videograms and their packaging to Licensor at cost or destroy them and provide Licensor with a customary certificate of destruction.

9.3. **Television Exploitation:** Licensee will not broadcast or authorize broadcast of the Picture by any form of Pay TV other than an encrypted form, and Licensee will not sell, rent or export or authorize the sale, rental or export of decoders for such encryption outside the Territory. Licensee will not broadcast or authorize broadcast of the Picture by any means from within the Territory where the broadcast is primarily intended for reception outside the Territory or is capable of reception by more than an insubstantial number of home televisions outside the Territory.

9.4. **Simultaneous Retransmissions:** If during the Agreement Term, Simultaneous Retransmissions are subject to Compulsory Administration in a country in the Territory, then Licensor reserves the right to collect all royalties for Simultaneous Retransmissions of the Picture in such country regardless of where the primary broadcast originated.

9.5. **Digital Broadcasts:** If during the Agreement Term, broadcasters in the Territory are required by Law to make simultaneous digital broadcasts of their analog broadcasts, then Licensee may authorize such simultaneous digital broadcasts, *provided that* both the analog and digital signal originate with the same broadcaster and duplicate the same content.

9.6. **Internet Broadcasts:** If during the Agreement Term, broadcasters in the Territory make their broadcasts simultaneously available on the Internet, then Licensor will give good faith consideration to authorizing such practice for the Picture subject to rights previously granted to others, *provided that* Licensee gives reasonable written assurances that Internet availability will only occur simultaneously with a broadcast of the Picture, will be only for the Authorized Language Use(s), will reasonably limit access to users within the Territory, and will incorporate technological safeguards that restrict copying or downloading of the Picture while on the Internet.

**10. MUSIC**

10.1. **Cue Sheets:** To the extent required and available, Licensor will supply Licensee promptly after Delivery of the Motion Picture with available music cue sheets listing the composer, lyricist and publisher of all music embodied in the Picture. Licensee will as necessary promptly file with the appropriate governmental agency or music rights society in the Territory the music cue sheets supplied by Licensor without change.

10.2. **Synchronization:** Licensor represents and warrants to Licensee that Licensor controls all rights necessary to synchronize the music contained in the Picture on all Copies exploited by Licensee throughout the Territory for the Agreement Term. Licensor authorizes Licensee to exploit such synchronization rights without charge in conjunction with its exploitation of the Picture. Licensor will be solely responsible for paying all royalties or charges necessary to obtain and control such synchronization rights for the Agreement Term, and Licensor will hold Licensee harmless from any payments in this regard.

10.3. **Mechanical:** Licensor represents and warrants to Licensee that Licensor controls all rights necessary to make mechanical reproductions of the music contained in the Picture on all Copies exploited by Licensee throughout the Territory for the Agreement Term. Licensor authorizes Licensee to exploit such mechanical rights without charge in conjunction with its exploitation of the Picture. Licensor will be solely responsible for paying all royalties or charges necessary to obtain and control such mechanical rights for the Agreement Term, and Licensor will hold Licensee harmless from any payments in this regard, *provided that* if a mechanical or authors' rights society

in the Territory refuses to honor the authorization obtained by Licensor in the country of origin of the Picture, then Licensee will be solely responsible for such royalties or charges.

10.4. **Performance:** Licensor represents and warrants to Licensee that the non-dramatic ("small") performing rights in each musical composition embodied in the Picture are: either (i) in the public domain in the Territory; or (ii) controlled by Licensor sufficient to allow Licensee to exploit the Licensed Rights without additional payment for such rights; or (iii) available by license from the local music performing rights society(ies) in the Territory affiliated with the International Confederation of Authors and Composers Societies (CISAC). With regard to music in category (iii), Licensee will be solely responsible for obtaining a license to exploit such performance rights from the local music performing rights society(ies).

10.5. **Publishing:** As between Licensor and Licensee, Licensor will be solely entitled to collect and retain the publisher's share of any music royalties arising from Licensee's exploitation of any Licensed Rights in the Picture.

**11. SUSPENSION AND WITHDRAWAL**

11.1. **Licensor's Right:** Licensor may suspend Delivery or withdraw the Picture by Notice to such effect at any time: (i) if Licensor determines in good faith that its exploitation might infringe the rights of others or violate any Law; (ii) if Licensor determines in good faith that its Materials are unsuitable for the manufacture of first class commercial quality exploitation materials; or (iii) due to Force Majeure.

11.2. **Effect Of Suspension:** The Agreement Term will be extended for the length of each suspension. Suspension will not be a material breach of this Agreement, and Licensee will only be entitled to incidental damages, but not direct or consequential damages (such as "lost profits") for any suspension. If any suspension extends Initial Delivery of the Picture beyond the Outside Delivery Date in the Deal Terms, if any, then the Picture will be treated as immediately withdrawn on such Outside Delivery Date without the necessity of any Notice. Otherwise, if any suspension lasts more than three (3) consecutive months, then either Party may cancel this Agreement on ten (10) days' Notice, in which case the Picture will be withdrawn.

11.3. **Effect Of Withdrawal:** If the Picture is withdrawn, then Licensor must promptly offer to substitute a Motion Picture of like quality mutually satisfactory to Licensor and Licensee without additional charge. If the Parties cannot timely agree on such a substitute, then Licensor must promptly refund to Licensee an equitable portion of the License fee paid to Licensor. Licensee's sole remedy will be to receive this substitute or refund. In no case may Licensee collect any consequential damages (including "lost profits"). If during the three (3) years after the date of Licensor' Notice of withdrawal or the date the Picture is deemed withdrawn Licensor elects to again release the Picture within the Territory, Licensee will have an exclusive right of First Negotiation to the extent the Agreement Term is still in effect to reacquire any of the Licensed Rights in the Picture within the Territory.

11.4. **Force Majeure:** Force Majeure means any fire, flood, earthquake, or public disaster; strike, labor dispute or unrest; unavoidable accident; breakdown of electrical or sound equipment; failure to perform or delay by any laboratory or supplier; delay or lack of transportation; embargo, riot, war, insurrection or civil unrest; any Act of God including severe inclement weather; any act of legally constituted authority; inability to obtain sufficient material, labor, transportation, power or other essential commodity or service required for the

conduct of either Party's business or any other cause beyond the reasonable control of either Party.

## 12. DEFAULT AND CANCELLATION

12.1. **Licensee's Default:** Licensee will be in default if: (i) Licensee fails to pay any installment of the License Fee when due; (ii) Licensee becomes insolvent or fails to pay its debts when due; (iii) Licensee makes an assignment for the benefit of creditors, seeks relief under any bankruptcy Law or similar Law for the protection of debtors, or allows a petition of bankruptcy to be filed against it or a receiver or trustee to be appointed for substantially all of its assets that is not removed within thirty (30) days; (iv) Licensee breaches any material term, covenant or condition of this Agreement or any other agreement with Licensor executed within eighteen (18) months before or after the Effective Date of this Agreement; (v) this Agreement applies to more than one Picture and Licensee breaches any material term, covenant or condition of this Agreement with respect to any Picture or all Pictures; (vi) a Licensee affiliate breaches any material term, covenant or condition of any other agreement with Licensor executed within eighteen (18) months before or after the Effective Date of this Agreement; or (vii) Licensee attempts to make any assignment, transfer, sublicense or appointment of an agent without first obtaining Licensor's approval under Paragraph 17. of the Standard Terms.

12.2. **Notice To Licensee:** Licensor will give Licensee Notice of any claimed default. If the default is capable of cure, then Licensee will have fourteen (14) days after receipt of Licensor's Notice to cure a monetary default, and twenty-one (21) days after receipt to cure a non-monetary default. If the default is incapable of cure, or if Licensee fails to cure within the time provided, then Licensor may proceed against Licensee for available relief, including canceling this Agreement retroactive to the date of default, suspending Delivery of the affected Picture (or for all Pictures), and declaring all unpaid amounts due Licensor under this Agreement immediately due and payable.

12.3. **Licensor's Default:** Licensor will be in default if: (i) Licensor fails to give Licensee a Notice of Initial Delivery before the Outside Delivery Date, if any, or otherwise fails to complete Initial Delivery as required; (ii) Licensor becomes insolvent or fails to pay its debts when due; (iii) Licensor makes an assignment for the benefit of creditors, or seeks relief under any bankruptcy Law or similar Law for the protection of debtors, or allows a petition of bankruptcy to be filed against it or a receiver or trustee appointed for substantially all of its assets that is not removed within thirty (30) days; or (iv) Licensor breaches any material term, covenant, or condition of this Agreement. Any default by Licensor is limited to the particular Picture affected, and no default by Licensor as to any one Picture or agreement with Licensee will be a default as to any other Picture or agreement with Licensee.

12.4. **Notice To Licensor:** Licensee will give Licensor Notice of any claimed default. Licensor will have fourteen (14) days after receipt of Licensee's Notice to cure a monetary default, and twentyone (21) days after receipt to cure a non-monetary default. If Licensor fails to cure within the times provided, then Licensee may proceed against Licensor for all available relief, including canceling this Agreement for the affected Picture retroactive to the date of default, *provided that*, however in no case may Licensee collect any consequential damages including "lost profits".

12.5. **Arbitration:** Any dispute under this Agreement will be resolved by final and binding arbitration under the IFTA™ Rules For International Arbitration in effect as of the Effective Date of this Agreement ("IFTA™ Rules"). Each Party waives

LF639; LF640

any right to adjudicate any dispute in any other court or forum, *except* that a Party may seek interim relief before the start of arbitration as allowed by the AFMA® Rules. The arbitration will be held in the Forum and under the Governing Law designated in this Agreement, or, if none is designated, as determined by the IFTA™ Rules. The Parties will abide by any decision in the arbitration and any court having jurisdiction may enforce it. The Parties submit to the jurisdiction of the courts in the Forum, with respect to interim relief, to compel arbitration or to confirm an arbitration award. The Parties agree to accept service of process in accordance with the IFTA™ Rules and agree that service in accordance with the IFTA Rules satisfies all requirements to establish personal jurisdiction over the Parties. Both Parties waive application of the procedures for service of process pursuant to the Hague Convention for Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters. Both Parties acknowledge that for an unsatisfied arbitration award that is confirmed by a court of competent jurisdiction, the prevailing Party may request that the other Party be barred from attendance at the American Film Market® in accordance with the arbitration and barring provisions of the most current AFM® Guidelines which are referred to as the "Market Rules."

## 13. ANTI-PIRACY PROVISIONS

13.1. **Copyright Notice Requirements:** Licensee will include on each Copy of the Picture distributed under its authority any copyright notice, work identifier and anti-piracy warning supplied by Licensor.

13.2. **Anti-Piracy Warning:** The anti-piracy warning must read substantially as follows:

**WARNING**

THIS MOTION PICTURE IS PROTECTED BY LAW.

Any unauthorized copying, distribution, performance, renting, lending, exporting, importing, dissemination or exhibition is prohibited by Law. Violators will be subject to criminal prosecution and civil penalties.

THIS MOTION PICTURE IS REGISTERED WITH THE IFTA™ ANTI-PIRACY PROGRAM

13.3. **Enforcement:** Licensee will take all reasonable steps to prevent piracy of the Picture in the Territory. Licensor may participate in any anti-piracy action using counsel of its choice. Licensor's expenses will be reimbursed from any recovery in equal proportion with Licensee's. If Licensee fails to take anti-piracy action, Licensor may do so in Licensor's or Licensee's name, with all recoveries belonging to Licensor.

13.4. **New Technology:** If during the Agreement Term new technology in use in the Territory inhibits the unauthorized duplication of Copies of the Picture, interferes with the reception of broadcast signals without use of an authorized decoding device, or otherwise provides protection against unauthorized exploitation of the Picture, then Licensee will use such technology in a reasonable manner in exploiting the Picture.

13.5. **No Warranty Against Piracy:** The Parties acknowledge that it is in their mutual interest to prevent piracy of the Picture in the Territory. Licensor has informed Licensee of any act of piracy of the Picture in the Territory of which Licensor is aware, and such information has been considered in determining the License Fee along with the other terms of this Agreement. Licensee has also taken all necessary steps to inform itself of any piracy of the Picture in the Territory before executing this Agreement. No piracy of the Picture, whether occurring before or after execution of this Agreement, will allow Licensee to terminate this Agreement, or reduce any amounts due to Licensor or alter the terms of exploitation including any

V: 2005
D: 9-Jun-11

Holdbacks. Licensor will cooperate with Licensee to prevent or remedy any such act of piracy.

## 14. LICENSOR'S WARRANTIES

14.1. **As Principal:** If the Cover Page indicates Licensor is a principal, then Licensor represents and warrants to Licensee that the following are true and correct as of the Effective Date of this Agreement:

14.1.1. Licensor has full authority and capacity to execute this Agreement and full legal and financial ability to perform all of its obligations under this Agreement;

14.1.2. There are no existing or threatened claims or litigation which would adversely affect or impair any of the Licensed Rights in the Territory during the Agreement Term;

14.1.3. Licensor has not licensed, encumbered or assigned any Licensed Right to any other Person in the Territory, in a manner that would interfere with any Licensed Right, and will not do so during its applicable License Period;

14.1.4. Licensor will not exploit or authorize exploitation of any Reserved Right in the Territory before the end of the applicable Licensor Holdback period;

14.1.5. The Picture was produced by authors who are nationals of or have their habitual residence in, or was first published or simultaneously first published in, a country which at the time of such production or publication was a signatory to the Berne Convention for the Protection of Literary and Artistic Works or the Universal Copyright Convention or the Buenos Aires Convention, and Licensor has not done any act or omitted to do any act which would impair the copyright in the Picture within the Territory during the Agreement Term; and

14.1.6. Neither the Picture nor the exercise of any Licensed Rights does or will during the applicable License Period: (i) defame, or hold in a false light, or infringe any privacy or publicity or other personal right of any Person; or (ii) infringe any copyright, trademark, trade secret, right of ideas, or similar property right of any Person. To the best of Licensor's knowledge as of the Effective Date of this Agreement, no use of any of the Delivery Materials does or will infringe any patent rights of any Person.

14.1.7. Licensor has undertaken reasonable efforts to ensure that its suppliers of essential special effects and other digital information embodied in the Delivery Materials have not included any electronic self-help instructions that will cause such digital information to cease operation of its own accord in such a manner as to materially impair Licensee's use of such Delivery Materials. This does not apply to electronic Rights Management Information that prevents unauthorized use of the Delivery Materials.

14.2. **As Agent:** If the Cover Page indicates Licensor is acting as an agent, Licensor represents and warrants to Licensee that the following are true and correct and will remain so throughout the Agreement Term:

14.2.1. Licensor has full authority from its principal designated on the Cover Page to enter into this Agreement on behalf of its principal and Licensor's principal will be bound by this Agreement;

14.2.2. Licensor's principal has made to Licensor each of the representations and warranties in Paragraph 14.1., and has authorized Licensor to make those representations and warranties directly from the principal to Licensee on the principal's behalf, and to the best of Licensor's knowledge they are all true and correct. In case of a breach of any representation or warranty in Paragraph 14.1., Licensee agrees to look directly to the principal and not to Licensor for any remedies Licensee might have.

## 15. LICENSEE'S WARRANTIES

15.1. **As Principal:** Licensee represents and warrants to Licensor that the following are true and correct and will remain so throughout the Agreement Term:

15.1.1. Licensee has full authority and capacity to execute this Agreement and full legal and financial ability to perform all of its obligations under this Agreement;

15.1.2. There are no existing or threatened claims or litigation which would adversely affect or impair Licensee's ability to perform under this Agreement;

15.1.3. Licensee is the type of entity and is domiciled as indicated on the Cover Page.

15.1.4. Licensee will honor all restrictions on the exercise of the Licensed Rights and the Allied Rights under this Agreement and will not exploit any Licensed Right outside the Territory, before the end of its Holdback, or after its License Period.

15.1.5. No authorized dubbed or subtitled version of the Picture created by Licensee does or will: (i) defame, or hold in a false light, or infringe any privacy or publicity or other personal right of any Person; or (ii) infringe any copyright, trademark, trade secret, right of ideas, or similar property right of any Person; or (iii) to the best of Licensee's knowledge at the time of its creation, infringe any patent rights of any Person.

15.2. **As Assignor:** In case of any assignment of this Agreement pursuant to Paragraph 17. of the Standard Terms, Licensee makes the following additional representations and warranties to Licensor:

15.2.1. As a condition to the effectiveness of such assignment, the assignee can and will make all of the representations and warranties set forth above in Paragraph 15.1. directly to Licensor; and

15.2.2. If the assignee breaches any of those representations and warranties, then Licensor, in addition to any other right or remedy, may proceed directly against Licensee for such breach without first proceeding against such assignee or exhausting any right or remedies against such assignee.

## 16. INDEMNITIES

16.1. **By Licensor:** Licensor will indemnify and hold harmless Licensee, its officers, directors, partners, owners, shareholders, employees, attorneys and agents, from all claims, loss, liability, damages or expenses, including, without limitation, reasonable outside attorneys' fees and legal costs, but not including lost profits, due to breach of any of Licensor's representations or warranties. Licensor will honor this indemnity despite any assignment of this Agreement. If Licensor is acting as an agent, these indemnities are also made directly by Licensor's principal to Licensee, but Licensee will look only to Licensor's principal to honor them.

16.2. **By Licensee:** Licensee will indemnify and hold harmless Licensor, its officers, directors, partners, owners, shareholders, employees, attorneys and agents, from all claims, loss, liability, damages or expenses, including, without limitation, reasonable outside attorneys' fees and legal costs, but not including lost profits, due to breach of any of Licensee's representations or warranties. Licensee will honor this indemnity despite any assignment, transfer, sublicense or appointment of an agent.

## 17. ASSIGNMENT AND SUBLICENSING

17.1. **Licensee's Limitations:** Before payment in full of the License Fee, Licensee may not assign this Agreement or delegate its obligations in whole or in part, or sublicense or use an agent to exploit any Licensed Rights, whether voluntarily or involuntarily, without Notice of Licensor's prior approval in Licensor's sole discretion, and any attempted assignment in breach of this provision will be void. A transfer of a controlling

interest in Licensee's capital stock or other evidence of ownership will be a transfer requiring Licensor's approval. This Agreement will be binding on any assignee, transferee, sublicensee or agent approved by Licensor but will not release Licensee from its obligations under this Agreement.

17.2. **Licensor's Rights**: Licensor may freely assign or transfer this Agreement or any of its rights under this Agreement, but no such assignment or transfer will relieve Licensor of its obligations under this Agreement, *unless* it is to a company which acquires all or substantially all of Licensor's assets and fully assumes all of the obligations hereunder.

## 18. MISCELLANEOUS PROVISIONS

18.1. **Separability**: In a conflict between this Agreement and any material Law, the latter prevails. If any provision herein is held to be unenforceable, the remaining provisions shall be in full force and effect.

18.2. **Approvals**: Where either Party may exercise any approval, it will do so promptly and in good faith, but in so doing a Party need not place the other Party's interests ahead of its own.

18.3. **No Waiver**: No waiver of a breach will waive any other breach. No waiver is effective unless it is contained in a record authenticated by the Party making the waiver. The exercise of any right will not waive any other right or remedy.

18.4. **Remedies Cumulative**: All remedies are cumulative, and resorting to one will not preclude resorting to any other at any time.

18.5. **Notices**: All Notices must be in a record authenticated by the sending Party and sent to the receiving Party at its address on the Cover Page by personal delivery, fax, courier or first class mail. Such Notice will be effective when received or deemed received pursuant to applicable Law. Notice may also be sent by e-mail, but then will not be effective until the recipient acknowledges receipt. Either Party may change its place for Notice by Notice duly given.

18.6. **Entire Agreement**: This Agreement contains the entire understanding of the Parties regarding its subject matter. It supersedes all previous written or oral negotiations, deal memos, understandings or representations between the Parties, if any. Each Party expressly waives any right to rely on such negotiations, understandings or representations, if any.

18.7. **Modification**: No modification of this Agreement is effective unless signed by both Parties.

18.8. **Terminology**: In this Agreement "and" means all possibilities, "or" means any or all possibilities in any combination, and "either...or" means only one possibility. "Including" means "including without limitation." "Must" or "will" means a Party has the obligation to act or refrain from acting; "may" means a Party has the right but not the obligation to act or refrain from acting.

18.9. **Additional Documents**: Upon reasonable request, each Party will execute and deliver such additional documents or instruments as are necessary to evidence, effectuate or confirm this Agreement.

18.10. **Governing Law**: This Agreement will be governed by and interpreted under the laws of the jurisdiction designated in Paragraph V.A. of the Deal Terms.

18.11. **Forum**: The Parties consent to the Forum designated in Paragraph V.C. of the Deal Terms as the exclusive place for resolving all disputes under this Agreement.

LF639; LF640



IFTA™ International
Standard Terms

V: 2005
D: 9-Jun-11

IFTA™ INTERNATIONAL
SCHEDULE OF DEFINITIONS

A.  **Cinematic Rights Definitions:**

*Cinematic* means *Theatrical*, *NonTheatrical* and *Public Video* exploitation of a Motion Picture.

*Theatrical* means exploitation of a Motion Picture Copy only for direct exhibition in conventional or drive-in theaters, licensed as such in the place where the exhibition occurs, that are open to the general public on a regularly scheduled basis and that charge an admission fee to view the Motion Picture.

*NonTheatrical* means exploitation of a Motion Picture Copy only for direct exhibition before an audience by and at the facilities of either organizations not primarily engaged in the business of exhibiting Motion Pictures, such as in educational organizations, churches, restaurants, bars, clubs, trains, libraries, Red Cross facilities, oil rigs and oil fields, or governmental bodies such as in embassies, military bases, military vessels and other governmental facilities flying the flag of the licensed territory.  NonTheatrical does not include Commercial Video, Public Video, Airline, Ship or Hotel exploitation.

*Public Video* means exploitation of a Motion Picture Copy embodied in a Videogram only for direct exhibition before an audience in a "mini-theater", an "MTV theater" or like establishment that charges an admission to use the viewing facility or to view the Videogram, and that is not licensed as a traditional motion picture theater in the place where the viewing occurs.

B.  **PayPerView Rights Definitions**

*PayPerView* means *NonResidential PayPerView*, *Residential PayPerView* and *Demand View* exploitation of a Motion Picture.  *PayPerView* does not include any form of *Pay TV* or *Free TV*, nor any form of making the Picture available over the Internet.

*Residential PayPerView* means the broadcast of a Motion Picture Copy by means of an encoded signal for television reception in homes or similar permanent living places where a charge is made to the viewer for the right to use a decoding device to view the broadcast of the Motion Picture at a time designated by the broadcaster for each viewing.

*NonResidential PayPerView* means the broadcast of a Motion Picture Copy by means of an encoded signal for television reception in hotels or similar temporary living places where a charge is made to the viewer for the right to use a decoding device to view the broadcast of the Motion Picture at a time designated by the broadcaster for each viewing.

*Demand View* means the transmission of a Motion Picture Copy by means of an encoded signal for television reception in homes and similar permanent living places where a charge is made to the viewer for the right to use a decoding device to view the Motion Picture at a time selected by the viewer for each viewing.

C.  **Ancillary Rights Definitions:**

*Ancillary* means *Airline*, *Ship* and *Hotel* exploitation of a Motion Picture.

*Airline* means exploitation of a Motion Picture Copy only for direct exhibition in airplanes that are operated by an airline flying the flag of any country in the licensed territory for which Airline exploitation is granted, but excluding airlines that are

customarily licensed from a location outside the licensed territory or that are only serviced in but do not fly the flag of a country in the licensed territory.

*Ship* means exploitation of a Motion Picture Copy only for direct exhibition in sea or ocean going vessels that are operated by a shipping line flying the flag of any country in the licensed territory for which Ship exploitation is granted, but excluding shipping lines that are customarily licensed from a location outside the licensed territory or that are only serviced in but do not fly the flag of a country in the licensed territory.

*Hotel* means exploitation of a Motion Picture Copy only for direct exhibition in temporary or permanent living places, such as hotels, motels, apartment complexes, co-operatives or condominium projects, by means of closed-circuit television systems where the telecast originates within or in the immediate vicinity of such living places.

D.  **Video Rights Definitions:**

*Video* means *Home Video* and *Commercial Video* exploitation of a Motion Picture, but does not include any form of making the Motion Picture available over the Internet.

*Home Video* means *Home Video Rental* and *Home Video SellThru* exploitation of a Motion Picture.

*Home Video Rental* means exploitation of a Videogram embodying a Motion Picture that is rented to the viewer only for non-public viewing of the embodied Motion Picture in a linear form within a private living place where no admission fee is charged for such viewing.

*Home Video SellThru* means exploitation of a Videogram embodying a Motion Picture that is sold to the viewer only for non-public viewing of the embodied Motion Picture in a linear form within a private living place where no admission fee is charged for such viewing.

*Commercial Video* means direct linear exhibition before an audience of a Videogram embodying a Motion Picture at the facilities of either organizations not primarily engaged in the business of exhibiting Motion Pictures, such as in educational organizations, churches, restaurants, bars, clubs, trains, libraries, Red Cross facilities, oil rigs and oil fields, or governmental bodies such as in embassies, military bases, military vessels and other governmental facilities flying the flag of the licensed territory, but only to the extent that such exploitation is not otherwise utilized in the licensed Territory as a form of NonTheatrical exploitation.  Commercial Video does not include NonTheatrical, Public Video, Airline, Ship or Hotel exploitation, nor any form of making the Picture available over the Internet.

E.  **Pay TV Rights Definitions**

*Pay TV* means *Terrestrial Pay TV*, *Cable Pay TV* and *Satellite Pay TV* exploitation of a Motion Picture.  *Pay TV* does not include any form of *PayPerView* nor any form of making the Picture available over the Internet.

*Terrestrial Pay TV* means over-the-air broadcast of a Motion Picture Copy by means of encoded Hertzian waves for television reception where a charge is made: (i) to viewers in private living places for use of a decoding device to view a channel that broadcasts the Motion Picture along with other programming; or (ii) to the operator of a hotel or similar

LF639; LF640

temporary living place located distant from where the broadcast signal originated for use of a decoding device to receive a channel that broadcasts the Motion Picture and other programming and retransmit it throughout the temporary living place for viewing in private rooms.

*Cable Pay TV* means an originating transmission of a Motion Picture Copy by means of an encoded signal over cable for television reception where a charge is made: (i) to viewers in private living places for use of a decoding device to view a channel that transmits the Motion Picture along with other programming; or (ii) to the operator of a hotel or similar temporary living place located distant from where the broadcast signal originated for use of a decoding device to receive a channel that broadcasts the Motion Picture and other programming and retransmit it throughout the temporary living place for viewing in private rooms.

*Satellite Pay TV* means the uplink broadcast of a Motion Picture Copy by means of an encoded signal to a satellite and its downlink broadcast to terrestrial satellite reception dishes for television viewing located in the immediate vicinity of the reception dishes where a charge is made: (i) to viewers in private living places for use of a decoding device to view a channel that broadcasts the Motion Picture along with other programming; or (ii) to the operator of a hotel or similar temporary living place located distant from where the broadcast signal originated for use of a decoding device to receive a channel that broadcasts the Motion Picture and other programming and retransmit it throughout the temporary living place for viewing in private rooms.

F.   **Free TV Rights Definitions:**

*Free TV* means *Terrestrial Free TV, Cable Free TV,* and *Satellite Free TV* exploitation of a Motion Picture. *Free TV* does not include any form of *PayPerView,* nor any form of making the Picture available over the Internet.

*Terrestrial Free TV* means over-the-air broadcast by Hertzian waves of a Motion Picture Copy for television reception in private living places without a charge to the viewer for the privilege of viewing the Motion Picture, *provided that* for this purpose government television assessments or taxes (but not a charge for PayPerView or Pay TV) will not be deemed a charge to the viewer.

*Cable Free TV* means the originating transmission by coaxial or fiber-optic cable of a Motion Picture Copy for television reception in private living places without a charge to the viewer for the privilege of viewing the Motion Picture, *provided that* for this purpose neither government television assessments or taxes nor the regular periodic service charges (but not a charge for PayPerView or Pay TV) paid by a subscriber to a cable television system will be deemed a charge to the viewer.

*Satellite Free TV* means the uplink broadcast to a satellite and its downlink broadcast to terrestrial satellite reception dishes of a Motion Picture Copy for television viewing in private living places located in the immediate vicinity of a viewer's reception dish without a charge to the viewer for the privilege of viewing the Motion Picture, *provided that* for this purpose government satellite dish or television assessments or taxes (but not a charge for PayPerView or Pay TV) will not be deemed a charge to the viewer.

G.   **Internet Rights Definitions:**

*Internet Rights* means *Internet Downloading* or *Internet Streaming* exploitation of a Motion Picture. *Internet Rights* do

not include any form of *PayPerView, Video, Pay TV or Free TV* exploitation of a Motion Picture.

*Internet Downloading* means exploitation of a digital Motion Picture Copy by making it available on the World Wide Web portion of the Internet in a manner that allows its transmission to a Computer for making another exact digital copy of the Motion Picture Copy and retaining the new digital copy for use for more than a transient period of time after completion of the initial continuous period of transmission. *Internet Downloading* does not include any form of *Internet Streaming.*

*Internet Streaming* means exploitation of a digital Motion Picture Copy by making it available on the World Wide Web portion of the Internet in a manner that allows continuous viewing of the Motion Picture Copy on a Computer in a substantially linear form substantially simultaneously with the transmission of such Motion Picture Copy over the Internet but which does not allow making another digital copy except for a transient period of time necessary to facilitate such viewing. *Internet Streaming* does not include any form of *Internet Downloading.*

*Internet Streaming/Downloading* means exploitation of a digital Motion Picture Copy by making it available on the World Wide Web portion of the Internet for both *Internet Downloading* and *Internet Streaming* at substantially the same time.

H.   **Video Use Definitions:**

*Cassette* means the same as VideoCassette.

*CD* means a Compact Disc.

*Compact Disc* means a combined optical and electronic analog storage device designed to be used in conjunction with an electronic device that causes a Motion Picture to be visible on the screen of a computer monitor or television for private viewing in a substantially linear manner.   A   Compact Disc does not include any type of VideoDisc or DVD.

*Disc* means an electronic storage device designed to be used in conjunction with an electronic device or a computer that causes a Motion Picture to be visible on the screen of a television or computer monitor for private viewing in a substantially linear manner.   A Disc includes a VideoDisc, Compact Disc or a DVD, but not a VideoCassette.

*DVD* means a digitally encoded electronic storage device that conforms to one of the following: (1) the DVD Specification for Read-Only Disc, version 1 (August 1996) or its successor, (2) the DVD Multi Specification for Read-Only Disc, version 1 (June 2001) or its successor, or (3) the HD DVD Specification for Read-Only Disc, version 1 (September 2005) or its successor, and that is designed for use in conjunction with an electronic device or computer in a way that causes a Motion Picture to be visible for private viewing on the screen of a computer monitor or television.   DVD includes Digital Versatile Discs, High Definition DVDs, and related DVD enabled peripherals such as DVD-ROM devices and DVD-RAM devices, but does not include any type of Compact Disc or VideoDisc.

*Laser Disc* is a type of VideoDisc.

*VCD* means Video Compact Disc.

*Video Compact Disc* means a type of compressed analog VideoDisc designed to be used solely on a special purpose electronic device that is solely dedicated for private viewing of a Motion Picture on the screen of a television in a substantially linear manner.

LF639; LF640

*VideoCassette* means a VHS or Beta cassette or comparable analog magnetic storage device designed to be used with a reproduction apparatus that causes a Motion Picture to be visible on a television screen for private viewing in a substantially linear manner. A VideoCassette does not include any type of VideoDisc or Compact Disc or DVD.

*Videogram* means any type of VideoCassette, Compact Disc, Disc, DVD or VideoDisc, but only to the extent use of the specific type of electronic storage device is authorized in the Agreement by the Parties.

*VideoDisc* means a laser or capacitance disc or comparable analog optical or mechanical storage device designed to be used with a reproduction apparatus that causes a Motion Picture to be visible on a television screen for private viewing in a substantially linear manner. A VideoDisc does not include any type of Compact Disc or DVD.

I.   **Internet Use Definitions:**

*Advertiser Supported* means making a Motion Picture Copy available on the World Wide Web portion of the Internet for accessing, downloading or streaming, by either: (i) including trailers, commercials or other advertising before, after, or within the continuity of the Motion Picture Copy; or (ii) including banners, logos, icons, text, hyper-text, meta-tags, symbols or other identifying information of a product or service or a supplier of such product or service provider on the same web page as the Motion Picture Copy or any of its elements or identifying information.

*Limited Use* means authorizing accessing, streaming or downloading, as applicable, of a Motion Picture Copy on the World Wide Web portion of the Internet by a user who is required to pay a separate fee to obtain a limited right to use a new digital copy of a Motion Picture Copy that may be accessed and viewed, but not further copied, subject to express limitations as to either the number of accesses or viewings, the period of access or viewing, or both (*e.g.* unlimited viewing for *x* days, or *x* viewings maximum, or *x* viewings within *y* days).

*Permanent Use* means authorizing downloading of a Motion Picture Copy on the World Wide Web portion of the Internet by a user who is required to pay a separate fee to obtain ownership of new digital copy of the Motion Picture Copy which new copy may be used and viewed, but not further copied, without express limitations as to the number of uses and viewings and the time period of so doing.

*Single Use* means authorizing accessing, streaming or downloading, as applicable, of a Motion Picture Copy on the World Wide Web portion of the Internet by a user who is required to pay a separate fee for each single act of accessing, streaming or downloading the Motion Picture Copy in whole or in part.

*Subscription Use* means authorizing accessing, streaming or downloading, as applicable, of a Motion Picture Copy on the World Wide Web portion of the Internet by a user who is required to pay a set fee for a specified period to access, stream or download, as applicable, the embodied Motion Picture along with other Motion Pictures available in the same manner on the same web site.

J.   **Other Rights Definitions:**

*Compact Disc Interactive* when used as a Right is a type of Interactive Multimedia Right and when used to describe a Work is a type of Interactive Multimedia Work.

*CDI* means the same as Compact Disc Interactive.

*Dubbed* means a Version of the Motion Picture in which the voices of performers on the original soundtrack are replaced with the voices of other performers speaking dialogue in an Authorized Language.

*Interactive Multimedia* means exploitation of an Interactive Multimedia Work by means of a computing device that allows the Interactive Multimedia Work to be directly perceived and manipulated by the user of the computing device and that either stores the Interactive Multimedia Work on the user's computing device or accesses a Copy of the Interactive Multimedia Work by electronic means from another computing device interconnected with and located in the immediate vicinity of the user's computing device.

*Interactive Networked Multimedia* means exploitation of an Interactive Multimedia Work over the facilities of a communications system that allows the user of a computing device to engage in two-way transmissions over the system to access the Interactive Multimedia Work, irrespective of the operator of the system or the means by which signals are carried, and that stores a Copy of the Interactive Multimedia Work for transmission over the system at a place distant from the place where the user's computing device is located.

*Interactive Multimedia Work* means a Work consisting primarily of a presentation communicated to a user through the combination of two or more media of expression, whether textual, audio, pictorial, graphical or audiovisual, where a significant characteristic of the presentation is the ability of the user to manipulate the content of the presentation by means of a computing device in real time and in a nonlinear fashion.

*Live Performance* means performance of a Motion Picture or its Underlying Material by live players, whether by reading, performance, musico-dramatic rendition or pantomime, where the performance occurs directly before a live audience or is broadcast live and without prerecorded material directly to the public, but excluding performances less than fifteen (15) minutes in length done for the purpose of advertising or publicizing the Motion Picture.

*Mail Order* means Home Video SellThru exploitation in which the sale occurs by placing an order for and receiving delivery of the Videogram through use of the postal service or other shipping service and not at a retail establishment. Ordering a Videogram over the telephone or through the Internet is not Mail Order.

*Merchandising* means distribution and sale of tangible goods, other than Copies of a Motion Picture or any of its Versions, that are based on or utilize the title of the Picture, the names, likenesses or characteristics of artists in their roles in a Motion Picture, or physical materials appearing in or used for a Motion Picture and that are made for sale to the general public. Merchandising does not include Interactive Multimedia, Interactive Networked Multimedia, Internet or Publishing rights.

*Near-Demand View* means multiple regularly scheduled transmissions in a short time period of a Motion Picture Copy by means of an encoded signal for television reception in homes and similar permanent living places where a charge is made to the viewer for the right to use a decoding device to view the Motion Picture at one of the scheduled transmission times selected by the viewer for each viewing.

*Near Video-On-Demand* means Near-Demand View

*NVOD* means Near Video-On-Demand or Near-Demand View.

LF639; LF640

*Parallel Tracked* means embodying a Copy of the Original Language Version of the Picture in a Compact Disc or DVD that also contains a Dubbed or Subtitled Version of the Picture in the Authorized Language Uses.

*Pay-Cable TV* means the same as Cable Pay TV.

*Publishing* means exploitation of hard cover or soft cover printed publications of a novelization of a Motion Picture or artwork, logos or photographic stills created for use in the Motion Picture that are included in such novelization.

*Subtitled* means a Version of the Picture in which a translation of the original dialogue appears on the bottom of the screen.

*VOD* means Video-On-Demand

*Video-on-Demand* means the same as *Demand View*.

K.    **Additional Definitions:**

*Affiliate* means any Person, including any officer, director, employee or partner of a Person controlled by, controlling or under common control with a Party.

*Authorized Format* means the formats for which the Licensor has authorized the Motion Picture to be exploited.

*Availability Date* means the first day after the end of the Holdback Period for a Licensed Right. If the Availability Date refers to a category of Licensed Rights, it refers to the first date on which Licensee may exploit any Licensed Right in the category. For example, the Pay TV Availability Date is the first date on which Licensee may exploit the Pay TV Terrestrial, Pay TV Cable or Pay TV Satellite Right.

*Broadcast* means the communication to the public of a Motion Picture by means of wire, cable, wireless diffusion or radio waves, terrestrially or by satellite, that allows the Motion Picture to be viewed on a television. Broadcast means the same as telecast or diffusion.

*Compulsory Administration* means any Law under which: (i) Simultaneous Retransmissions are subject to compulsory license; (ii) systems or other Persons may simultaneously retransmit such Simultaneous Retransmissions without first obtaining direct authorization from rightsholders or Persons making originating broadcasts; or (iii) rightsholders may only grant or withhold authorization for Simultaneous Retransmissions remunerated through collective management societies, collective contractual agreements or local Law.

*Copy* means the embodiment of a Motion Picture in any form, including film, tape, cassette, disc or digital file. Where a specific Licensed Right is limited to exploitation in an Authorized Format (for example, to Videograms), then Copy with respect to such Licensed Right is limited to such Authorized Format. *Exhibition* means the same as public performance.

*First English Release* means, with respect to each Licensed Right, the date on which a Motion Picture is first made available to the public through the exercise of such Licensed Right in the major country within the Region whose recognized official language is English or, if there is no such country in the Region, in the United States

*First Release* means the earliest of: (i) the date on which the Motion Picture must be released as designated in the Deal Terms; or (ii) the date on which the Picture is first made generally available to the paying public in the Territory, either through exhibition in cinemas, sale of Videograms, or telecast; or (iii) six (6) months after Notice of Initial Delivery.

*First Theatrical Release* means the date on which the Motion Picture is first made generally available to the paying

public in cinemas in the Territory, excluding festival and awards screenings.

*First Video Release* means the date on which Videograms embodying the Motion Picture is first made generally available for sale to or rental by the paying public in the Territory.

*First Negotiation* means, *provided that* Licensee is then actively engaged in the distribution business on a financially secure basis, Licensor will negotiate exclusively with Licensee in good faith for a period of ten (10) days after receipt of Notice by Licensor regarding the matter for which Licensee has a First Negotiation right before entering into negotiations regarding the matter with any other Person. If no agreement is reached within this time period, then Licensor will be free to stop negotiations with Licensee and then to negotiate and conclude an agreement regarding the proposed matter with any other Person on any terms.

*Licensed Channel* means a specific television channel transmitting as an identified broadcast service and designated in the Deal Terms.

*Licensed Telecasts* means the total number of Authorized Runs and Playdates specified in the Deal Terms.

*Law* means any statute or ordinance, whether municipal, state, national or territorial, any executive, administrative or judicial regulation, order, judgment or decree, any treaty or international convention, or any rule, custom or practice with force of law.

*Local Language(s)* mean the primary language(s) spoken in each country of the Territory.

*Motion Picture* means an audiovisual work consisting of a series of related images that, when shown in succession, impart an impression of motion, with accompanying sounds, if any.

*Original Language* means the primary language spoken in the dialogue of a Motion Picture in its original version.

*Outside Release Date* means the date on which Licensee must release the Picture in the First Release Medium, if so specified in the Deal Terms.

*Party* means either Licensor or Licensee.

*Person* means any natural person or legal entity.

*Playdate* means one or more telecasts of the Picture during a twenty-four (24) hour period over the non-overlapping telecast facilities of an authorized telecaster such that the Picture is only capable of reception on televisions within the reception zone of such telecaster during such period.

*Principal Photography* means the actual photographing of a Motion Picture, excluding second-unit photography or special effects photography, requiring the participation of the director and the on-camera participation of a featured member of the principal cast.

*MultiPlexing* means transmission of a Motion Picture over related broadcast channels supplied by the same broadcaster or pay service.

*Remake* means a new Motion Picture derived from an existing Motion Picture or its Underlying Material in which substantially the same characters and events as shown in the existing Motion Picture are depicted.

*Rights* means rights, licenses and privileges under copyright, trademark, neighboring rights or other intellectual property rights with regard to any type of exploitation of a Motion Picture or its Underlying Material, including the rights to duplicate, adapt, distribute, perform, display and make available in accordance with the customary requirements of each specific licensed media.

LF839; LF640

*Rights Management Information* means any information embodied, attached, related or appearing in or on a Motion Picture Copy that may include a copyright notice or other identifier, that identifies the copyright owner, producer, author, writer, director, performers or other Persons who have contributed to the making of the Motion Picture, or that describes any authorized terms and conditions for licensing or use of the Motion Picture or the Motion Picture Copy.

*Run* means one (1) telecast of the Motion Picture during a twenty-four (24) hour period over the non-overlapping telecast facilities of an authorized telecaster such that the Picture is only capable of television reception within the reception zone of such telecaster once during such period. A simultaneous telecast over several interconnected local stations (*i.e.* on a network) constitutes one (1) telecast; a telecast over non-interconnected local stations whose signal reception areas do not overlap constitutes a telecast in each station's local broadcast area.

*Sequel* means a new Motion Picture derived from an existing Motion Picture or its Underlying Material in which a character, event or locale depicted in the existing Motion Picture or its Underlying Material is shown engaged in or as the subject of substantially new and different events than those depicted in the existing Motion Picture.

*Simultaneous Retransmission* means the simultaneous, unaltered and unabridged retransmission by an operator other than the licensed broadcaster of a Motion Picture by cable, microwave or telephone system for reception by the public of an initial transmission.

*Underlying Material* means the literary and other material from which a Motion Picture is derived or on which it is based, including all versions of the screenplay, all notes, memos, direction, comments, ideas, stage business and other material incorporated in any version of the Motion Picture, and, to the extent necessary rights and licenses have been duly obtained, all existing novels, stories, plays, songs, events, characters, ideas, or other works from which any version of the Motion Picture is derived or on which it is based.

*Version* means an adaptation of a Motion Picture that is not accomplished by merely mechanical reproduction or use of minimal originality but instead uses original artistic or intellectual expression to create a new Work in its own right which contains materials or expressions of authorship not found in the original Motion Picture.

*Work* means an original expression of authorship in the literary, scientific or artistic domain whatever may be the mode or form of its expression.

L.   **Additional Internet Rights Terminology**

*Access (access)* means to make available a Motion Picture Copy on the Internet in a manner that allows a user to copy, view, stream, download or use, or to obtain data or information about or related to, the Motion Picture Copy or its embodied Motion Picture. *Access* includes *accessing*.

*Computer* means an electronic device that accepts a Motion Picture Copy in digital form and allows its viewing or manipulation in response to a sequence of instructions where the type and order of the instructions can be defined, selected and entered by the user of the Computer. A Computer includes desktops, notebooks and laptops and excludes VCR, DVR, DVD, set top box players or recorders and Handheld Devices.

*Digital Rights Management* means a sequence of software or hardware instructions embodied in, related to or activated by a Motion Picture Copy that controls or manages copying, viewing, altering, or accessing the Motion Picture, its content or elements or associated Rights Management Information.

*Download (download)* means to make available a Motion Picture Copy on the Internet in a manner that allows its transmission to a Computer for making another exact digital copy of the Motion Picture Copy and retaining such copy for use for more than a transient period of time after completion of the initial continuous period of transmission. *Download* includes *downloading*.

*DRM* means Digital Rights Management.

*Handheld Device* means a mobile electronic device a substantial purpose of which is facilitating telephonic or text communication, digital photography or data storage and which customarily fits in a human hand, and which incorporates functionality that allows viewing of a Motion Picture Copy. Handheld Device includes personal mobile phones, personal digital assistants and other similar devices, but does not include a Computer.

*Internet* means the interconnected facilities of a publicly available packet-switching communications system that allows the user of a computing device to engage in two-way transmissions over the system through which the user obtains access to a Motion Picture Copy stored in digital form at a place distant from the place where the user's computing device is located.

*Stream (stream)* means to make available a Motion Picture Copy on the Internet in a manner that allows continuous viewing of the Motion Picture Copy in substantially linear form on a Computer simultaneously with the transmission of such Motion Picture Copy over the Internet but which does not allow making another digital copy except for a transient period of time necessary to facilitate such viewing. *Stream* includes *streaming*.

# EXHIBIT "C"

Home › Arbitration › Rules for International Arbitration

## Rules for International Arbitration

INDEX

0. Prior Rules

1. General Provisions

2. The Request for Arbitration

3. The Administering Agency

4. The Panel of Arbitrators

5. Representation and Assistance

6. Appointment of the Arbitrator

7. Location of Arbitration

8. Jurisdiction and Procedure in the Arbitration

9. Meetings and Hearings

10. Interim Measures of Protection

11. Default

12. The Award

13. Applicable Law

14. Costs

15. Waiver of Claims Against Alliance and Others

16. Miscellaneous Provisions

As of January 1, 2012

0. Prior Rules.

**0.1.** The Independent Film & Television Alliance ("Alliance" or "IFTA") was formerly known as AFMA and the American Film Marketing Association.

**0.2.** These Independent Film & Television Alliance Rules for International Arbitration were formerly known as the AFMA Rules for International Arbitration or the American

Film Marketing Association Rules for International Arbitration ("IFTA Rules" or "Rules"). Where appropriate, any contract referring to the AFMA Rules for International Arbitration or the American Film Marketing Association Rules for International Arbitration shall be deemed to refer to the applicable version of the IFTA Rules.

1. General Provisions.

**1.1** These Rules shall govern:

**1.1.1** Any dispute submitted to arbitration under these Rules by agreement of the parties or involving the interpretation or enforcement of an agreement which designates these Rules as the controlling rules for the enforcement of the rights of the parties under any such agreement, any defense or counterclaim thereto.

**1.1.2** An "affiliate" of a member for purposes of these Rules is an entity that (i) owns or controls the member; or (ii) is owned or controlled by a member; or (iii) is owned or controlled by an entity which is an affiliate of a member.  For purposes of this Rule 1.1.2, "owned by" means ownership of the shares of stock or other evidence of ownership in an amount exceeding fifty percent (50%), and "controlled by" means that the company has the authority to determine the business decisions of another.

**1.2** It is the purpose of these Rules to provide the parties seeking enforcement of their rights arising under Rule 1.1 with an economical and expeditious procedure for resolving their disputes.  Any Arbitrator designated under the provisions of these Rules shall be authorized to interpret these Rules broadly to the end that complete relief may be afforded to the parties in any dispute arising hereunder.

**1.3** The Alliance shall, from time to time, establish a filing fee schedule for arbitrations conducted pursuant to these Rules under these procedures ("Fee Schedule").  Filing fees are non-refundable.

2. The Request for Arbitration.

**2.1** The party initiating arbitration (hereinafter called "claimant") shall give to the other party (hereinafter called "respondent") formal written notice of arbitration (the "Notice of Arbitration").  Claimant shall be solely responsible for complying with applicable law regarding service of process on respondent(s) and, if required pursuant to any applicable agreements, for providing a copy of the Notice of Arbitration to third parties (i.e. non-parties to the arbitration).  The parties waive application of the Hague Convention for Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters with regard to service of process.

**2.2** Arbitration proceedings shall be deemed to commence upon receipt of the Notice of Arbitration by the Arbitral Agent as set forth in Rule 2.5.

**2.3** The Notice of Arbitration (and each other communication concerning such arbitration proceedings) shall be deemed transmitted by IFTA when sent to the respondent by:  (1) fax, email or other electronic communication system which provides a confirmation of receipt; (2) personal delivery; (3) registered mail (or by regular mail service if to a country which does not recognize registered mail); or (4) courier or other comparable

method of delivery to the address shown for respondent in the agreement under which the arbitration is sought or to any address which the claimant has been informed by respondent or which is known to be the last known place of business, habitual residence, or the mailing address of the respondent. The Notice of Arbitration and all other notices required to be transmitted to the parties or other individuals under the provisions of these Rules shall be deemed to have been received as of actual receipt provided by proof of delivery or ten (10) days after transmittal, as defined in this Rule, whichever shall be the earlier.

**2.4** The Notice of Arbitration shall contain:

**2.4.1** A demand that the dispute be referred to arbitration.

**2.4.2** The names, addresses, telephone numbers, fax numbers and, if available, email addresses, of the parties.

**2.4.3** The names, addresses, telephone numbers, fax numbers and, if available, email addresses, of the parties' counsel or other representative.

**2.4.4** A copy of the arbitration clause under which the claim arises.

**2.4.5** A copy of the contract out of or in relation to which the dispute arises.

**2.4.6** A statement of the nature of the dispute and the amount involved, if any.

**2.4.7** The relief or remedy sought.

**2.5** A copy of the Notice of Arbitration shall be transmitted by the claimant to the Arbitral Tribunal addressed as specified in Rule 3.3 at the same time as transmittal is made to the respondent pursuant to Rule 2.1 and shall be accompanied by payment of the filing fee as required by the Fee Schedule referred to in Rule 1.3.

**2.6** If a counterclaim or cross-claim is filed, it shall be transmitted by the counter-claimant or cross-claimant to the Arbitral Tribunal addressed as specified in Rule 3.3 at the same time as transmittal is made to the counter-respondent or cross-respondent and shall be accompanied by payment of the filing fee as required by the Fee Schedule referred to in Rule 1.3.

3. The Administering Agency.

*("The Arbitral Tribunal")*

**3.1** The Alliance, a California non-profit corporation, has designated Independent Film & Television Alliance Arbitration to be the Arbitral Tribunal for all arbitrations governed by these Rules.

**3.2** The President of the Alliance shall designate an Alliance staff member (the "Arbitral Agent") to act as the supervising representative for all acts required to be performed by the Arbitral Tribunal under these Rules. The name, address, phone number and email address of the Arbitral Agent shall be provided to all parties to arbitration proceedings under these Rules and to any party contemplating arbitration proceedings hereunder.

**3.3** All documents required to be filed with the Arbitral Agent under these Rules shall be forwarded to the Arbitral Tribunal c/o The Arbitral Agent at 10850 Wilshire Boulevard, Ninth Floor, Los Angeles, California 90024, U.S.A., or such other address which may be designated from time to time by the Alliance Board of Directors.

**3.4** The Arbitral Agent shall do all acts and carry out all responsibilities set forth in these Rules for the Arbitral Agent and all additional acts reasonably required for the efficient administration of these arbitration procedures including, but not limited to, the appointment of the Arbitrator as provided in Rule 6 hereafter.

**3.5** No party or its representative shall have any ex parte communication with the Arbitrator. Copies of all written communications transmitted to the Arbitrator and to any party shall at the same time be filed with the Arbitral Agent. The official record of the arbitration shall be maintained by the Arbitral Agent.

**3.6** Prior to the appointment of the Arbitrator, the Arbitral Agent may make such decisions regarding procedural matters as may be required from time to time under these Rules. After the appointment of the Arbitrator, notices of all such matters shall be forwarded to the Arbitrator (with copy to the Arbitral Agent) for decision and the Arbitrator shall make such decision. The Arbitral Agent shall forward notice of all such decisions to the parties.

**3.7** In extraordinary circumstances and in the interests of justice, the Arbitral Agent (or the Arbitrator after his/her appointment) may extend any time period designated in these Rules but only where the Arbitral Agent is satisfied that the request for extension of time is not for the purpose of delaying the proceedings.

4. The Panel of Arbitrators.

**4.1** A panel of Arbitrators composed of lawyers qualified by experience to deal in matters relating to the entertainment industry shall be established by the Alliance. Arbitrators hereunder shall be appointed from among the members of the panel unless to do so is impractical under these Rules. In the latter event, the Arbitral Agent shall appoint Arbitrators similarly qualified by experience from outside the panel.

**4.2** The panel shall be composed of active lawyers licensed to practice law from various countries throughout the world. Arbitrators may be added to or removed from the panel from time to time at IFTA's sole discretion.

**4.3** The composition of the panel shall be updated not less frequently than once each year. A list containing the names, addresses, business and professional affiliates and brief personal resumes of the members of the panel shall be made available to all

parties desiring to utilize the IFTA Rules or parties to contracts utilizing an Independent Film & Television Alliance arbitration clause or any arbitration clause in any prior name of the Alliance (e.g., AFMA, American Film Marketing Association) on the public website of the Alliance or upon request delivered to the Alliance.

**4.4** Any Arbitrators appointed to act under these Rules shall be and remain at all times wholly independent and impartial and shall not act as advocate for any party in connection with the subject arbitration.

5. Representation and Assistance.

**5.1** Each party may be represented in the arbitration by counsel or other representative. The name and address of any representative must be communicated in writing to the other party and to the Arbitral Agent as soon as such selection has been made.

**5.2** After such representative has been designated by a party, further communications to any party shall include at all times a copy of such communication directed to such counsel or other representative. The transmittal of a copy to the representative shall not relieve the communicating party of the responsibility to also send any such notice directly to the opposing party to the proceeding.

6. Appointment of the Arbitrator.

**6.1** Promptly upon receipt of the Notice of Arbitration, the Arbitral Agent shall transmit to each of the parties (if possible by fax, email or other electronic means) a copy of the Notice of Arbitration, a copy of the IFTA Rules, and a list of not less than three (3) proposed Arbitrators if reasonably practicable, showing the name, address and resume of each proposed Arbitrator.

**6.2** Within five (5) business days of receipt of the proposed list of Arbitrators, each party shall return the list deleting therefrom any names of Arbitrators unacceptable to that party. The remaining names on the list shall be rated in numerical order showing as number one, the person most favored, number two, the person next most favored, etc.

**6.3** Within seven (7) days of the receipt of the list from each of the parties or five (5) days from the last day provided for the return of the list in Rule 6.2, whichever occurs earlier, the Arbitral Agent shall designate as the Arbitrator for the dispute the person available to serve as Arbitrator who has received the most favorable acceptance on the lists returned by the parties. If two or more proposed Arbitrators receive equally favorable acceptance from all parties, then the Arbitral Agent shall designate an Arbitrator from among them. If no proposed Arbitrator receives favorable acceptance from all parties, then the Arbitral Agent shall submit a list of not less than three (3) alternate proposed Arbitrators, if reasonably practicable, to the parties for rating in accordance with Rule 6.2. The Arbitral Agent shall then designate an Arbitrator in accordance with this Rule. If no proposed Arbitrator on the alternate list receives favorable acceptance from all parties, then, in the interest of expeditious resolution of the dispute, the Arbitral Agent shall designate an Arbitrator whose name has not previously been submitted, without the necessity of resubmitting names to the parties.

Each of the parties and the Arbitrator shall be promptly notified of the selection of the Arbitrator.

**6.4** If any party fails to return the list as provided in Rule 6.2, the Arbitral Agent shall select as Arbitrator the person with the highest rating on the other party's list who is available to serve for the arbitration. The exercise of discretion by the Arbitral Agent in the selection of the Arbitrator under provisions of this Rule 6 shall not be subject to challenge except as set forth in Rule 6.5 and 6.6.

**6.5.** A prospective Arbitrator shall disclose to the Arbitral Agent and the parties in connection with such Arbitrator's possible appointment as Arbitrator any circumstances likely to give rise to justifiable doubt as to the Arbitrator's impartiality or independence as to the parties or the matter in dispute in accordance with the procedural law of the jurisdiction of the place of the arbitration, or, if none is specified, then the laws of the State of California.

**6.6** An Arbitrator may be challenged if circumstances exist which give rise to justifiable doubt as to the Arbitrator's impartiality or independence as to the matter or parties at issue.

**6.6.1** A party may challenge an Arbitrator by giving notice of his/her challenge to the other party, to the Arbitrator and to the Arbitral Agent. Such notification shall be in writing and shall state the reasons for the challenge, and must be made within seven (7) business days after discovery of the facts on which the challenge is based, but prior to the Arbitrator's issuance of a final award or tentative final award. The Arbitral Agent may, in his/her sole discretion, suspend or continue the arbitral proceedings during the pendency of the challenge.

**6.6.2** When an Arbitrator has been challenged by one party, the other party may agree to the challenge and substitution of a new Arbitrator; the Arbitrator may withdraw from his/her office as Arbitrator; or the Arbitral Agent may determine without passing on the bona fides of the grounds of challenge that a sufficient issue exists to justify the replacement of the Arbitrator and appointment of a new Arbitrator. Removal or replacement of an Arbitrator under any of these circumstances shall not imply acknowledgment of the truth or the validity of the grounds for the challenge. If an Arbitrator is removed after an arbitration hearing, but prior to the issuance of an award, then a new hearing will be held. If the Arbitrator has issued a final award or a tentative final award, then no removal or replacement of the Arbitrator shall take place.

**6.6.3** In the event that a new Arbitrator must be appointed under Rule 6.6.2, the new Arbitrator shall be designated by the Arbitral Agent in the same manner as set forth in this Rule 6. If a second or subsequent Arbitrator is similarly replaced, the Arbitral Agent may in the interest of expeditious resolution of the dispute designate the new Arbitrator without necessity to resubmit any list of names to the parties.

**6.6.4** If the Arbitral Agent declines to exercise the option to replace the Arbitrator as referred to in Rules 6.6.2 and 9.1, the Arbitrator shall continue as the Arbitrator for the dispute and the challenge shall be deemed to have been overruled.

**6.6.5** In the event of the death, incapacity, resignation, or failure or other inability of an Arbitrator to act at any time after appointment, the Arbitral Agent shall appoint a successor Arbitrator under Rule 6.6.3.

**6.6.6** The Arbitral Agent, in his/her sole discretion, may remove any Arbitrator who does not comply with the provisions of Rule 9.1. If any such Arbitrator is removed, the new Arbitrator shall be designated by the Arbitral Agent in the same manner as set forth in Rule 6.

**6.6.7** The Arbitral Agent's decision as to the appointment, confirmation, challenge or replacement of an Arbitrator will be final and the reasons for such decision will not be communicated.

### 7. Location of Arbitration.

**7.1** All arbitrations under these Rules shall take place in the forum specified by the agreement or if none, in Los Angeles County, California unless a request to designate an alternate situs is made to the Arbitrator by a party within ten (10) days of the Arbitrator's appointment by the Arbitral Agent. If a request for an alternate situs is made, then the Arbitrator in his/her sole discretion shall determine the situs of the arbitration for the convenience of the parties and/or witnesses. The parties, by mutual agreement, may determine that the arbitration shall take place at a different location, but such designation of an alternate location must be by mutual agreement in writing with a copy of such agreement filed with the Arbitral Tribunal prior to the selection of the Arbitrator.

### 8. Jurisdiction and Procedure in the Arbitration.

**8.1** The Arbitrator shall have all jurisdiction and powers to make rulings as to procedures for the conduct of the arbitration including, but not limited to, the situs of the arbitration, the governing law and the arbitrability of any claims or cross–claims which the Arbitrator deems necessary or proper to ensure the just, expeditious, economical and final determination of all matters in dispute.

**8.2** The Arbitrator shall exercise all powers granted to commercial Arbitrators under the laws of the State of California, USA or the laws of the jurisdiction where the arbitration shall take place, if other than in the State of California; and the parties shall be entitled to all rights granted to arbitration participants under the laws of such jurisdictions, including, if allowed, the right to seek and obtain a declaration of rights, injunctive or other equitable relief. All arbitrations shall be conducted under, shall be subject to and shall be enforceable by the laws of the State of California, unless the parties agree otherwise in writing and transmit a copy of said written agreement to the Arbitrator and the Arbitral Agent or unless otherwise designated by the Arbitrator pursuant to Rule 13.1. The parties may apply for confirmation and/or enforcement of any arbitration award or order hereunder to the courts of the State of California or of such other state, locality, country or territory as may have jurisdiction over the parties under applicable law, Treaty or Convention.

**8.3** The Arbitrator shall rule on his/her own jurisdiction, including ruling on any objections with respect to the existence or validity of the agreement of the parties to arbitrate; for that purpose, an arbitration provision which forms part of an agreement or alleged agreement of the parties shall be treated as an agreement independent of the other terms of such agreement, so that a decision by the Arbitrator that such agreement is null and void shall not entail the invalidity of such arbitration provision.

**8.4** Although the Arbitrator shall be empowered to grant only compensatory and not exemplary or punitive damages, an award nonetheless including such prohibited damages shall be valid and enforceable, but shall be deemed amended to exclude such damages.  This provision shall not preclude any party hereto from applying to a court of appropriate jurisdiction for such damages in accordance with applicable law.

**8.5** The respondent shall transmit a statement setting forth the facts and other contentions of law on which respondent's defense is based and any counterclaim or cross-complaint and the relief claimed thereunder not later than twenty-one (21) days after receipt from the Alliance of:

(a)     A copy of the Notice of Arbitration; and
(b)     The IFTA Rules.

**8.5.1** Respondent's statement of defense or any counterclaim or cross-complaint and the relief claimed thereunder shall be transmitted to the Arbitral Tribunal c/o the Arbitral Agent as specified in Rule 3.3 at the same time as the transmittal is made to claimant. Any counterclaim or cross-complaint shall set forth the same matters as required for the original filing of the arbitration claim under Rule 2 and shall be accompanied by payment of the filing fee as required by the Fee Schedule referred to in Rule 1.3 and available at the Arbitration link at www.ifta-online.org or by contacting the Arbitral Agent.

**8.5.2** Any response to a counterclaim or cross-complaint shall be transmitted to the Arbitral Tribunal c/o the Arbitral Agent addressed as specified in Rule 3.3 at the same time as the transmittal is made to counterclaimant or cross-claimant within fourteen (14) days of receipt from the Alliance of the counterclaim or cross-complaint and the IFTA Rules.

**8.5.3** Any counterclaims or cross-complaints filed in response to a counterclaim or cross-complaint shall be accompanied by payment of the filing fee as required by the Fee Schedule referred to in Rule 1.3. The counterclaim or cross-complaint shall be transmitted to the Arbitral Tribunal c/o the Arbitral Agent addressed as specified in Rule 3.3 at the same time as the transmittal is made to counterclaimant or cross-claimant within fourteen (14) days of receipt from the Alliance of the counterclaim or cross-complaint and the IFTA Rules.

**8.6** Any counter-respondent or cross-respondent may file a response to a counterclaim or cross-complaint but if none is filed, the counterclaim and/or cross-complaint shall be deemed to be denied by such counter-respondent or cross-respondent.

**8.7** After submission of the statements required hereunder or in the event one party fails to file documents in a timely manner, the Arbitrator shall give the parties written direction

for the further conduct of the arbitration and the parties shall be bound by such directions.

**8.8** Except as provided herein, no formal discovery procedures shall be permitted under these Rules; except that the parties may by mutual agreement or on order of the Arbitrator (a) exchange lists of anticipated witnesses and/or summaries of the testimony anticipated to be elicited from each of its witnesses; (b) exchange documents or other evidence to be introduced at the hearing; (c) submit pre-hearing briefs, or any or all of the above. Additionally, in the interest of justice, the Arbitrator may permit formal depositions or other appropriate discovery of information, but such procedures shall not be permitted to delay the orderly and speedy processes of the arbitration

9. Meetings and Hearings.

**9.1** The Arbitrator shall fix the date, time and place of meetings and hearings in the arbitration, and the Arbitrator shall give all parties adequate written notice thereof. In setting such dates, the Arbitrator shall give due consideration to the distance which any party to the arbitration must travel in order to be present at the arbitration proceedings. The arbitration shall be set for hearing, or submission on written materials if it is decided that no hearing is to be held, at the earliest possible date consistent with these considerations, which date shall not be later than sixty (60) days after the last response to the last claim is filed or is due to be filed with the Alliance. However, the Arbitrator may designate a later day for such proceedings for good cause, but such date shall not be later than one hundred twenty (120) days after the last response to the last claim is filed or is due to be filed with the Alliance unless the parties and the Arbitrator collectively agree to extend such date or the Arbitrator extends the date for good cause. Except in the event of the Arbitrator's delay due to the Arbitrator's disability, or other cause beyond the control of the parties, if the claimant (or counterclaimant) fails to prosecute its claim (or counterclaim) to such hearing or submission within such applicable period, the Arbitrator shall dismiss the claim and any counterclaim or cross-complaint without prejudice. If the Arbitrator is unable, due to the Arbitrator's disability, conflicting obligations, or otherwise, to proceed as required in these Rules, upon written application of any party, the Arbitral Agent may remove the Arbitrator and recommence the procedures for selection of an Arbitrator to serve as an alternate Arbitrator. Upon the appointment of such an alternate Arbitrator, and upon written request from the Arbitral Agent, the original Arbitrator shall promptly deliver to the alternate Arbitrator or the Arbitral Agent all documents and other materials previously delivered to or lodged with the Arbitrator.

**9.2** Subject to any adjournments which the Arbitrator allows, the hearing will be conducted on successive working days until it is concluded.

**9.3** All meetings and hearings will be in private unless all the parties agree otherwise.

**9.4** The Arbitrator shall determine the rules of procedure for the arbitration; and shall resolve any disputes as to the jurisdiction of the Arbitrator. The Arbitrator shall have sole discretion whether to allow testimony by letter or affidavit or by telephone in the presence of representatives of both parties, and establish such other reasonable rules of evidence or other procedures as may be required in any particular case to achieve justice and fairness for the parties expeditiously and at minimal cost and expense. The

parties may by mutual consent, and with the approval of the Arbitrator, waive an oral hearing and submit the dispute to the Arbitrator for award on written submissions in a form and manner to be approved by the Arbitrator.

**9.5** The Arbitrator shall determine the admissibility, relevance, materiality and weight of any evidence offered by either of the parties; and shall otherwise conduct the hearing in such manner as he/she deems appropriate provided the parties are treated with equality and at any stage of the proceedings each party is given a full opportunity to present its case within reasonable constraints of time as determined by the Arbitrator.

**9.6** The Arbitrator may determine whether a written record shall be kept of the proceeding and shall permit the parties to submit written or oral argument in support of their respective positions.

**9.7** Unless expressly agreed by the parties, the Arbitrator shall determine the language in which the arbitration is to be conducted; but, where required, reasonable provision shall be made for translations of testimony.

**9.8** In arbitrations where the sums of money or the issues in dispute do not justify the expenditure of time and cost for travel to the site selected for the arbitration, either of the parties may request of the Arbitrator that the dispute be resolved without requiring a formal hearing and solely or in part by a filing of such appropriate documents and/or telephonic examination as shall be determined by the Arbitrator. The propriety of conducting the arbitrations solely or partly upon written documentation shall be determined solely in the discretion of the Arbitrator.

10. Interim Measures of Protection.

**10.1** The arbitration of all issues including the determination of the amount of any damages suffered by any party hereto by reason of the acts or omissions of another shall be to the exclusion of any court of law (except for court actions permitted as provided by these Rules). Arbitration hereunder shall not in any event: (i) prevent any party from seeking and obtaining interim equitable relief, including but not limited to, prohibitory or mandatory injunctions, specific performance or extraordinary writs in any court of law or equity having jurisdiction nor (ii) prevent any party from enjoining any other party in any action brought by or against a third party with respect to the subject matter of the arbitration nor (iii) prevent any party from filing legal action hereunder to effectuate any attachment or garnishment, provided that such party stipulates in such action, at any other party's request, to arbitration on the merits of the case, nor (iv) prevent a party from filing legal action to compel arbitration under the arbitration provisions hereof.

**10.2** Further, at the request of any party, the Arbitrator may make interim awards and orders where necessary to safeguard the subject matter of the arbitration or effectuate the proceedings and, in this regard, may grant any remedy or relief, including but not limited to, provisional remedies and temporary injunctive relief and/or specific performance. The Arbitrator shall be entitled to require deposits or security for costs in connection with such measures. Any interim award issued by the Arbitrator shall be entitled to the same power of enforcement in appropriate courts of law as a final

arbitration award to the extent provided by law.

11. Default.

**11.1** If, after proper notice, one of the parties fails to respond to any demand by the Arbitrator for documents or other materials, or fails to appear for a hearing or in any manner fails to conform to the provisions of these Rules or any order of the Arbitrator, the Arbitrator may declare that party to be in default and make appropriate orders or interim awards to require compliance or may make a final award based upon the evidence that is before the Arbitrator at such time or may be subsequently received by the Arbitrator under formal proceedings authorized under these Rules except that no final award shall be issued in any arbitration under these Rules without the prevailing party establishing a prima facie case to the satisfaction of the Arbitrator. However, no default shall be found after the matter has been submitted for decision solely because of a party's failure to pay the Arbitrator's fees.

12. The Award.

**12.1** The Arbitrator's award shall be made in writing and shall be signed by the Arbitrator and shall contain the date and place where the award is made. The Arbitrator shall render his/her decision not later than forty–five (45) days after the matter has been submitted for decision. This time period can only be extended for good cause by the Arbitral Agent.

**12.2** The Arbitrator shall state the findings on which the award is based unless the parties have agreed that no findings are to be given.

**12.3** The Arbitrator shall transmit the award to the Arbitral Agent. Copies of the award signed by the Arbitrator shall be transmitted to the parties by the Arbitral Agent by email or fax, where such information is known, and followed by certified or registered mail, or any licensed domestic or international courier, or by any form of receipted express mail.

**12.4** Within thirty (30) days after receipt of the award, either party, with notice to the other party, may request the Arbitrator to correct in the award any errors in computation, any clerical or typographical errors, or errors of similar nature. If any corrections are made by the Arbitrator (either upon request of a party or otherwise), they must be made in writing and filed with the Arbitral Tribunal and sent to the parties within thirty (30) days of receipt of such request by the Arbitrator.

**12.5** Any party may seek confirmation of and/or file or register the Arbitrator's award with a court having jurisdiction to confirm the Arbitrator's award in order to effectuate the enforcement of the award in any and all courts throughout the world. Service of any petition, summons or other process necessary to obtain confirmation of the Arbitrator's award may be accomplished by any procedure authorized by applicable law, Treaty or Convention, except that the parties waive application of the Hague Convention for Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters with respect to service of process.

13. Applicable Law.

**13.1** The Arbitrator shall apply the laws of the State of California to all arbitrations conducted under these Rules unless the parties by mutual agreement or by the contract to be enforced provide that the Arbitrator shall apply the law of one other jurisdiction, or the Arbitrator for good cause designates another location to be the situs of the arbitration in which case the Arbitrator shall have the discretion to apply for good cause the law of the situs of the arbitration.

**13.2** The final award is not subject to appeal. The parties may agree to expanded judicial review of the final award by a court of competent jurisdiction, however, in no event shall any such appeal be heard by the IFTA Arbitration Tribunal. The parties are responsible for determining whether the governing law of the agreement to arbitrate allows for such review.

14. Costs.

**14.1** The Arbitrator may allocate the costs of the arbitration in the award. The term "costs" includes the following, but within the sole discretion of the Arbitrator as to the awarding of any specific item:

**14.1.1** The fees of the Arbitrator (which shall at all times be consistent with the Fee Schedule);

**14.1.2** The travel and other expenses incurred by the Arbitrator in reaching the location of the arbitration;

**14.1.3** Actual costs of any party incurred in the prosecution or defense of the arbitration including some or all of the party's attorney's fees and costs if the Arbitrator determines it is an appropriate case for such an award.

**14.2** The general principle to be applied to payment of costs shall be that the parties shall share equally the costs referred to in Rules 14.1.1 and 14.1.2; but the Arbitrator shall have the power to make an appropriate order in situations which in the sole discretion of the Arbitrator justify an unequal allocation of the costs or the bearing of all the costs by one of the parties.

**14.3** At any time after the commencement of the arbitration process, the Arbitral Agent or the Arbitrator shall have the right to require each party to deposit with the Arbitral Agent or the Arbitrator an equal amount as an advance against the Arbitrator's fees. The Arbitrator shall give formal notice of any such failure to meet the deposit requirements and the consequences of such failure. The failure of any party to meet the deposit requirements may be deemed by the Arbitrator to be a default under Rule 11 above, unless otherwise provided by applicable law. The Arbitrator may direct the other party or parties to pay the outstanding amounts to allow the arbitration to proceed (subject to any award on costs). If such payment is not made by claimant(s), the Arbitrator may dismiss the proceedings without prejudice. The Arbitrator may dismiss a claim or counterclaim, without prejudice, if a party fails to timely provide the full amount

of the required deposit. The Arbitral Agent shall transmit all deposits to the Arbitrator upon receipt.

**14.4** Any party may challenge any fee requested by the Arbitrator by appealing to the Arbitral Agent to determine the propriety, fairness and reasonableness of the fee requested. Such challenge must be submitted within forty-five (45) days of the transmission of the final invoice after the arbitration that is the subject of the challenge has concluded. The party challenging the fee requested by the Arbitrator must provide specific reasons for the challenge, including the actual charges disputed, and, if applicable, supporting documentation. Such challenge shall not be served on the Arbitrator or any other party. The decision of the Arbitral Agent is final and the parties and the Arbitrator shall be bound by such decision.

15. Waiver of Claims Against Alliance and Others.

**15.1** The Alliance, the Arbitral Agent, and any and all Arbitrators engaged pursuant to these Rules and their agents, employees, and representatives have elected to maintain and administer these Rules and the Arbitral Tribunal hereunder (as applicable) as a service to the international entertainment community for the purpose of fostering international trade and cooperation and of avoiding prolonged and expensive international court litigation. Inasmuch as the involvement of all such parties is for such public purpose, it is in the public interest to avoid involving any such parties in disputes or claims concerning their conduct relating to arbitrations hereunder, since such disputes or claims would be likely to have a negative impact on the desire of parties to act in such public service capacities. Accordingly, subject to the applicable provisions of the law, all parties to each arbitration brought under these Rules acknowledges, consents and agrees that the Alliance, the Arbitral Tribunal hereunder, and the officers, employees, directors, and agents of each of the foregoing, as well as the Arbitral Agent and the Arbitrator(s) utilized under these Rules, shall not be appropriate, necessary, or proper parties in any litigation or other judicial or regulatory proceeding related in any way to the arbitration; and neither IFTA, nor its employees and agents, shall be liable for damages in any way to any party in connection with any arbitration brought or responded to under these Rules; and by accepting arbitration under these Rules, all parties hereby expressly and impliedly waive, to the extent permissible under applicable law, any and all claims or actions for money or other damages they may have now or at any time in the future against each and all of the foregoing parties relating to or in connection with arbitrations brought or responded to under these Rules, including but not limited to the Alliance's normal administration of its Rules, disqualification of the Arbitrator or any other act or omission; except that this Rule 15 shall not be deemed to include a waiver of a good faith claim which any party may have against an Arbitrator that the Arbitrator (i) shall have failed to promptly disclose to the parties such Arbitrator's known conflict of interest in a proceeding before such Arbitrator; or (ii) acted in bad faith in making an Award hereunder.

**15.2** The Arbitrator shall have the immunity of a judicial officer from civil liability when acting in the capacity of Arbitrator under any statute or contract. The immunity afforded by the Rules shall supplement, and not supplant, any otherwise applicable common law or statutory immunity.

16. Miscellaneous Provisions.

**16.1** In the event the parties agree on a settlement of a dispute during the arbitration proceedings, the Arbitrator shall terminate the arbitration upon written notice of a settlement by all parties and the settlement may be recorded by the Arbitrator in the form of an arbitral award made on the agreed terms if mutually requested by the parties. If a dismissal is ordered by the Arbitrator as a result of a written notice of settlement, such dismissal should specify whether it is with or without prejudice.

**16.2** Any time period or procedural requirement of these Rules may be waived or extended by the Arbitrator or, if no Arbitrator has been appointed, by the Arbitral Agent on showing of good cause therefor, except as otherwise expressly provided in these Rules.

**16.3** In circumstances not specifically provided for in these Rules, the Arbitrator shall follow the rules of arbitration procedures in effect in the jurisdiction where the arbitration takes place.

**16.4** These Rules shall remain in full force and effect as they may be amended from time to time by action of the Board of Directors of the Alliance. Any amendment to these Rules shall be effective on the date approved by the Board of Directors of the Alliance. Unless otherwise provided in the contract, the applicable Rules are the Rules in effect on the effective date of the agreement to arbitrate.

**16.5** Notwithstanding anything in these Rules, in accordance with applicable law and the agreement of the parties, the Arbitrator may engage in mediation or conciliation of the dispute at any time during the arbitral proceedings for the purpose of encouraging settlement. However, if the Arbitrator acts as a mediator, such Arbitrator will be disqualified from serving as Arbitrator on that matter.

**16.6** Notwithstanding any contrary provision in the parties' contract, the Alliance may in its discretion, but shall not be required to, publicize in publications originating from it, information concerning arbitrations, parties to them, and awards which are made.

**INDEPENDENT FILM & TELEVISION ALLIANCE®**
10850 Wilshire Blvd., 9th floor
Los Angeles, CA 90024
Tel: 310-446-1000
Fax: 310-446-1600
www.ifta-online.org

Copyright 2012 Independent Film & Television Alliance® All Rights Reserved.

00/00/2012  13:17:27 FAX 2132499990      NATIONWIDE LEGAL EXPRESS



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CV12-06434 (AS (JCGx))

| HANNIBAL PICTURES, a California corporation, | Case No. |
| --- | --- |
| Petitioner, | [PROPOSED] ORDER CONFIRMING ARBITRATION AWARD |
| v. | Hearing Date: September 10, 2012 |
| LES FILMS DE L'ELYSEE, a Belgium corporation, | Time: 10:00 |
| Respondent. | Dept.: 5 |
| | Judge: Snyder |

Petitioner HANNIBAL PICTURES' Motion for Order Confirming Arbitration Award came on regularly for hearing on September 10, at 10:00 a.m./p.m., in Department 5 of the above-entitled court, located at 255 East Temple Street, Los Angeles, California 90012. Appearances were as noted on the record.

This matter having been fully argued and considered, and proof being made to the satisfaction of the Court, and good cause appearing, IT IS HEREBY ORDERED:

1. The Final Award of the IFTA International Arbitration Tribunal, dated May 15, 2012, resolving Case No. 11-44 ("May 15, 2012 Award") is confirmed in all respects;

2. Respondent LES FILMS DE L'ELYSEE ("Respondent" or "Les Films") shall pay to Petitioner Hannibal damages in the amount of One Hundred Thousand Four

-1-

[PROPOSED] ORDER CONFIRMING ARBITRATION AWARD

HAMRICK & EVANS, LLP

1  Hundred Eighty Seven Dollars ($100,487) ("Award Amount"), in accordance with

2  the terms of the May 15, 2012 Award;

3     3.   The IFTA International Multiple Rights Distribution Agreement ("Agreement")

4  between Petitioner Hannibal and Respondent Les Films, dated November 3, 2009,

5  is terminated, and Respondent shall forthwith return to Petitioner all material

6  previously delivered pursuant to the Agreement, in accordance with the terms of

7  the May 15, 2012 Award;

8     4.   Respondent Les Films shall pay to Petitioner Hannibal pre-judgment interest on the

9  Award Amount, at the rate of ten percent (10%) per annum, from the date of entry

10  of the May 15, 2012 Award to the date of entry of Judgment pursuant to this

11  Motion, totaling _____ Dollars and

12  _____ Cents ($_____.____);

13     5.   Respondent Les Films shall pay to Petitioner Hannibal post-judgment interest on

14  the total of the Award Amount and pre-judgment interest thereon, at the applicable

15  rate based on the weekly average one year constant maturity Treasury yield, from

16  the date of entry of Judgment pursuant to this Motion to the date of payment; and

17     6.   Respondent Les Films shall pay to Petitioner Hannibal attorneys' fees and costs

18  incurred in connection with enforcement of the May 15, 2012 Award, including

19  fees and costs relating to this Motion, totaling _____

20  Dollars and _____ Cents ($_____.____).

21       THEREFORE IT IS SO ORDERED that the Motion is <u>GRANTED</u> in its entirety, and that

22  Judgment shall be entered in conformity therewith.

23

24  DATED: _____, 2012          By: _____

25

26                     United States District Court Judge

27

28

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I certify and state that I am now and at all times herein mentioned was, a citizen of the United States, over the age of eighteen (18) years, a resident of the County of Los Angeles, and not a party to the within action or cause. My business address is Hamrick & Evans, LLP, 111 Universal Hollywood Drive, Suite 2200, Universal City, California 91608.

I hereby certify that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I further certify that on July 26, 2012, I caused to be served the copies of the attached:

**NOTICE OF MOTION AND MOTION FOR ORDER CONFIRMING ARBITRATION AWARD; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF A. RAYMOND HAMRICK, III; [PROPOSED] ORDER** on the parties in said action as follows:

☒     **BY CERTIFIED INTERNATIONAL MAIL:** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, for collection and mailing at my place of business following ordinary business practices. Said document(s) will be deposited with United States Post Office mail box at Universal City, California, addressed as follows:

**SEE ATTACHED SERVICE LIST**

☐     **BY FACSIMILE:** I caused said document(s) to be transmitted by facsimile machine, telephone number (818) 763-2308, pursuant to California Rules of Court, Rule 2005. The facsimile machine I used complied with Rule 2003(3) and no error was reported by the machine. Pursuant to Rule 2008(e), I caused the machine to print a record of the transmission, a copy of which will be provided upon request. Said fax transmission occurred as stated in the transmission record and was directed as stated above.

☐     **BY OVERNIGHT DELIVERY:** I served such envelope or package to be delivered on the same day to an authorized courier or driver authorized by the overnight service carrier to receive documents, in an envelope or package designated by the overnight service carrier.

☐     **BY ELECTRONIC MAIL:** On the above-mentioned date, from Universal City, California, I caused each such document to be transmitted electronically to the party(ies) at the e-mail address(es) indicated below. To the best of my knowledge, the transmission was reported as complete, and no error was reported that the electronic transmission was not completed.

☐     (State) I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☐     (Federal) I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.

Executed on July 26, 2012, at Universal City, California.

[Signature]

**SERVICE LIST**

Arnaud Nuyts
Liedekerke Wolters Waelbroeck Kirkpatrick
Boulevard de l'Empereur 3 Keizerslaan
B-100 Brussels-Belgium
T: +32 2 551 15 15
F: +32 2 551 14 14

Attorneys for Respondent
LES FILMS DE L'ELYSEE

HAMRICK & EVANS, LLP

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Christina A. Snyder and the assigned discovery Magistrate Judge is Jay C. Gandhi.

The case number on all documents filed with the Court should read as follows:

## CV12- 6434 CAS  (JCGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

00/00/2012  13:17:27 FAX  2132499990        NATIONWIDE LEGAL EXPRESS

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
HANNIBAL INC. dba HANNIBAL PICTURES, a California corporation

**DEFENDANTS**
LES FILMS DE L'ELYSEE, a Belgium corporation

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
A. Raymond Hamrick, III; Martin J. Barab; Rebecca L. Worden
HAMRICK & EVANS, LLP
111 Universal Hollywood Drive, Suite 2200
Universal City, California 91608
Telephone: (818) 763-5292

Attorneys (If Known)
Arnaud Nuyts
Liedekerke Wolters Waelbroeck Kirkpatrick
boulevard de l'Empereur 3 Keizerslaan
B-100 Brussels – Belgium
Telephone + 32 2 551 15 15

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No  ☒ MONEY DEMANDED IN COMPLAINT: $ 100,487.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Motion for Order Confirming Arbitration Award

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accom-modations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☒ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities – Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | **IMMIGRATION** | ☐ 446 American with Disabilities – Other | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

**FOR OFFICE USE ONLY:**    Case Number:    CV12-06434

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)                    CIVIL COVER SHEET                    Page 1 of 2

American LegalNet, Inc.
www.FormsWorkflow.com

00/00/2012  13:17:27 FAX 2132499990          NATIONWIDE LEGAL EXPRESS                                2

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?   ☒ No  ☐ Yes
If yes, list case number(s) _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?   ☒ No  ☐ Yes
If yes, list case number(s) _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District: * | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District: * | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Belgium |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District: * | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date July 26, 2012
                                        A. Raymond Hamrick, III

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

CV-71 (05/08)                              **CIVIL COVER SHEET**                                Page 2 of 2

American Legal Net, Inc.
www.FormsWorkflow.com